**359 P.2d 1050**

**C. G. GREEN, Plaintiff and Appellant,**

**v.**

**Edgar E. GARN and Cleo V. Garn, Defendants and Respondents.**

**E. E. GARN, Plaintiff and Respondent,**

**v.**

**Frances B. JENSEN et al., Respondents and Cross-Defendants,**

**C. G. Green, Intervenor and Appellant.**

Nos. 9302 and 9303.

Supreme Court of Utah.

March 6, 1961.

Richards, Bird & Hart, Salt Lake City, for appellant.

Ray S. McCarty, Salt Lake City, for respondents.

WADE, Chief Justice.

These appeals are by C. G. Green, who is the appellant in each case from summary judgments in favor of Edgar E. Garn and Cleo V. Garn, his wife, the respondents herein. Insofar as appellant is concerned the two actions as to the respondents Garn herein involves appellant Green's attempts to collect from them sums he claims are due him for sale of a business. His two actions were consolidated for pretrial and since they involve the same subject matter they were treated as one matter and disposed of as such although separate judgments were entered in each case. Hereafter we shall refer to respondents and appellant by name.

In order to sustain a summary judgment it "must be supported by evidence, admissions and inferences which when viewed in the light most favorable to the loser shows that, 'there is no genuine issue

:as to any material fact and that the moving party is entitled to a judgment as a matter ·of law.' *Such showing must preclude all reasonable possibility that the loser could, if given a trial, produce evidence which would reasonably sustain a judgment in his favor."* [1] (Emphasis ours.)

The record discloses that Green had ·purchased the lease of a casino and bar ·called the Copper Club, together with its ·equipment and inventory. About six months later Green sold the lease, equipment and inventory of the Copper Club to the Garns for an agreed price of $20,000. Under the terms of this agreement of sale ·the Garns gave Green a promissory note for $5,000, which was secured by an assign-·ment of their interest in a lease of the Lone Pine Lodge in Marysvale, Utah. This promissory note was payable one year from its date, or when the Garns' interest in the Lone Pine Lodge lease was sold, which-·ever occurred first. The balance of the ·purchase price was to be paid up to $500 per month from the profits of the business ·after the Garns had first taken $500 per month from such profits as a living wage, the entire amount on the purchase price, however, was to be paid before the lease Green was selling expired.

The Garns operated the club from about December, 1947, to September, 1948, during which time they were unable to make any payments because the business was not profitable. Some time before August 16, 1948, Green was contacted by Mr. Garn and advised that business was very bad, and that their resources were exhausted and Green expressed regret and indicated that if the Garns could find someone else to take over the contract, he would not object. Mr. Garn listed the Copper Club for sale with a real estate firm. Subsequent to this listing a letter was received by Mr. Garn from Green dated August 16, 1948, wherein Green, after stating that he had talked to the real estate agent handling Mr. Garn's listing of the sale of the Copper Club further stated:

"I told him that you would be willing to take $5,000.00 and step out in favor of a new buyer, so he suggested this procedure: Take a new listing for 90 days under my signature at a price of $17,500 complete. Now rest assured that you will be protected to the extent of $5000.00. Anything over that amount comes to me, and if a contract has to be written for any balance, a new one will be written between the new buyer and myself, thus cancelling the contract between you and I. I hope this is clear to you so there can be no misunderstanding when a deal is finally negotiated."

The Garns did not follow the suggestions of Green in this letter but on September 18, 1948, sold their interest in the Copper

---

1. Bullock v. Deseret Dodge Truck Center, Inc.. 11 Utah 2d 1, 354 F.2d 559, 561.

Club to Messrs. Burrows, Jensen and Payne and received therefor $3,100 cash less commission fees and a promissory note for $900 payable in 60 days. The total purchase price for the Copper Club was $15,000, with a $10,000 balance to be paid in monthly installments of $100, together with interest. The purchasers took possession of the Copper Club from the Garns and operated the business for a few months when they decided to give it up and liquidate the stock. Green was not a party to the sale of the Copper Club to Messrs. Burrow, Jensen and Payne.

On December 29, 1948, the Garns filed suit against the purchasers of their interest in the Copper Club for the payment of the promissory note. The defendants in the Garns' suit interpleaded the real estate agents who sold Garns' interest to them and counterclaimed, pleading fraud. They further alleged that Green had not authorized these real estate agents to act as his agents or brokers, and that they had not been able to secure an assignment of the lease or any contract for the sale of the property. In February, 1949, Green commenced a suit against the Garns seeking to recover the amounts he claimed were due him under the provisions of his contract of sale of the Copper Club to them. On January 21, 1950, Green filed a complaint in intervention in the Garns' case against Burrows, Jensen and Payne the purchasers of the Garns' interest. In this complaint

Green admitted that the real estate agents who handled the deal were not authorized to act for him but alleged that he acquiesced in the purchasers' possession of the premises and by such acquiescence he accepted the offer they had made to pay $10,000 for his interest in the Copper Club.

There is nothing inconsistent between the allegations of Green's complaint in intervention and his claim against the Garns for the balance they owe him under their contract. There is no claim that he received any payment on such contract from any other source. The fact that he was willing to accept and claimed the right to receive payment of $10,000 from Burrows, Jensen and Payne does not discharge the obligation of the Garns, in the absence of any payments being made, to pay in accordance with the terms of their contract with Green. However, assuming there was an inconsistency, we must remember that under Rule 8(e) (2), U.R.C.P., a party may state as many separate claims or defenses as he has regardless of consistency. Therefore, even though Green in his complaint in intervention pleaded that he had accepted the offer of the purchasers of the Garns' interest in the Copper Club to purchase his interest in that club, such pleading does not preclude him from also pleading and proving, if he can, that he at no time released the Garns from their obligation under their contract to purchase from him. Although the trial court was of the opinion

that the record established a surrender of the premises or a rescission and abandonment of the contract by Green, and that he was estopped from claiming anything from the Garns, we are of the opinion that if the summary judgments could be sustained at all, it would be only on the ground that there was a mutual rescission of the contract of sale between the Garns and Green or that he agreed to release them from their obligation to pay the amount owing under such contract. There is nothing in the pleadings, evidence or depositions which would sustain a judgment that Green surrendered or abandoned his rights under the contract or that he was estopped to assert any rights he had under his contract. The record shows that Green surrendered the premises to the Garns under his contract of sale to them, and there is no showing that Green surrendered his lease of the club to anyone, other than his right of possession which he gave to the Garns under his contract of sale. The Garns surrendered their right of possession to third parties by selling their equity in their contract with Green. But it does not follow from the Garns' surrender of the premises that Green surrendered his rights. Neither does the record require a finding that Green abandoned his rights in his contract with the Garns. Mr. Garn's own testimony in his deposition is to the effect that he felt he would have closed the doors of the estab-

lishment and walked out of the deal without any further ado if Green hadn't suggested that he see what he could do about finding someone else to take over. This offer of Green to allow the Garns to try to work out some means to help their predicament certainly cannot be construed as an abandonment of his rights under his contract with them. Nor does the record show that this offer caused the Garns to act in the manner they did upon some representation of Green, and that they would not have done so but for such representation and therefore changed their position to their injury. So Green is not estopped to claim any rights he may have against them under their contract.[2]

 Does the record taken in the light most favorable to Green preclude the possibility that he could produce evidence which would prove there was no mutual rescission of his contract with the Garns? To constitute a mutual rescission of a contract it must be agreed to by both parties. As stated in 12 Am.Jur., page 1011, Sec. 431:

"Persons competent to contract can as validly agree to rescind a contract already made as they could agree to make it originally. However, to have the effect of discharging a contract, an agreement of rescission must be a valid agreement. Two minds are re-

2. 19 Am.Jur. Sec. 34. page 634.

quired to change the terms and conditions of a contract after it is executed. As a contract is made by the joint will of two parties, it can be rescinded only by the joint will of the two parties. It is obvious that one of the parties can no more rescind the contract, without the other's express or implied assent, than he alone can make it. A proposal to rescind a contract does not become a binding agreement unless it is accepted before its withdrawal. A proposal, threat or offer to cancel a contract not acted upon leaves the contract in full force * * * a contract may be discharged by conduct as well as by words."

From the record it conclusively appears that Mr. Garn wished to rescind the contract. Green offered to rescind the contract if he, Green, would be allowed to list the sale of the Copper Club himself with the real estate agent and appear as the seller. If this had been done and a new contract entered into between Green and the new purchasers, then the agreement between the Garns and Green would have been cancelled. The Garns chose not to accept this proposition, but instead listed their equity for sale and sold it. Green never entered into a new contract with the purchasers of the Garns' interest. Although it appears that Green knew that the Garns had listed their equity for sale and had discussed this matter with the Garns' real estate agent, he denies, and it does not conclusively appear, that he authorized these real estate agents to act for him in the sale. Since Mr. Garn did not accept Green's proposition expressed in the letter to him that Green list the club for sale himself with the real estate agents, and if a sale were made Green would see that the Garns received $5,000 for their interest and would cancel the contract, this offer cannot be the basis of a mutual rescission. The fact that Green acquiesced in Mr. Garn's proposal that Mr. Garn try to get something out of his investment does not require a finding that he relinquished any of his own rights under the contract or rescinded it. It follows that the court erred in granting the summary judgments.

Reversed. Costs to appellant.

McDONOUGH, CALLISTER, and CROCKETT, JJ., concur.

HENRIOD, J., dissents.