Chad A. SPOR, Ray Spor, Paul C. Spor, Spor Brothers Motor Company, a Utah corporation, Spors, Inc., a Utah corporation, and Gold-Spor Mining Company, a Wyoming corporation, Plaintiffs and Respondents,

v.

CRESTED BUTTE SILVER MINING, INC., a Colorado corporation, Defendant, Third-Party Plaintiff, and Appellant,

v.

CANDELARIA METALS, INC., a Nevada corporation, Third-Party Defendant.

No. 19403.

Supreme Court of Utah.

June 25, 1987.

---

Earl Jay Peck, Douglas K. Pehrson, Salt Lake City, for Spors.

H. Wayne Wadsworth, R.L. Knuth, Salt Lake City, for Crested Butte.

Robert H. Wilde, Midvale, for Candelaria Metals.

STEWART, Associate Chief Justice:

The plaintiffs, the Spors,[1] brought this action to declare a rescission or termination of a preincorporation contract they had entered with Crested Butte Silver Mining, Inc. Crested Butte counterclaimed against the Spors, alleging breach of contract and seeking specific performance. Crested Butte also sued Candelaria Metals, Inc., to compel Candelaria to release mineral properties covered by the preincorporation contract that Candelaria had leased from the Spors.

The Spors filed a motion for summary judgment. In a memorandum opinion, the trial court ruled that Crested Butte and the Spors had agreed to a mutual rescission and to an accord and satisfaction of the preincorporation contract. Accordingly, the court granted the Spors summary judgment and dismissed Crested Butte's claim against Candelaria because it was dependent upon Crested Butte's counterclaim against the Spors. Crested Butte appeals from the summary judgment and the dismissal on the ground that there are disputed factual issues as to whether the preincorporation contract had been rescinded or terminated by an accord and satisfaction. We reverse and remand for further proceedings.

Crested Butte and the Spors executed an "Agreement to Incorporate" ("Agreement") dated July 30, 1979. The Agreement contemplated the creation of a new corporation to be called Gold-Spor Mining Company. The main section of the contract provided that Crested Butte and the Spors would become equal shareholders. Each party was to receive 1,000,000 shares of stock in the new company. Crested Butte was required to contribute two large pieces of mining equipment to Gold-Spor, and the Spors were to contribute certain real and personal property. The agreement specifically provided that the contribution of the properties by each party was to constitute "full payment for [each party's] one million shares of the capital stock

---

1. "The Spors" means the individual and corporate plaintiffs combined or in separate capaci-

ties, but does not represent Gold-Spor Mining Company.

of Gold-Spor...." There was no other condition to be met for the parties to receive the stock.

In a separate section of the contract, Crested Butte agreed, "[u]pon the formation of Gold-Spor," to lend Gold-Spor up to $150,000 "as may be requested by Gold-Spor." Gold-Spor was required to execute a promissory note with a five-year term at eight percent interest. The loan was to be secured by Gold-Spor's issuance of up to 200,000 shares of additional stock to Crested Butte. The loan from Crested Butte was contingent only "[u]pon the formation of Gold-Spor," and the money was to be paid as "may be requested by Gold-Spor." The loan proceeds were not required to be used in the business and were, in fact, used for personal purposes.

Gold-Spor was incorporated July 31, 1979. The Spors contributed their properties to the new corporation, as required, and on February 19, 1980, the Spor family, without authorization by Gold-Spor's board of directors, caused one million shares of stock to be issued to themselves and their relatives.

Crested Butte, however, did not contribute the equipment it contracted to transfer. Nevertheless, Crested Butte claims that at all times it has been ready, willing, and able to transfer the equipment, but asserts that the Spors were required to assist Crested Butte in the transfer of the equipment and have failed to do so. Specifically, one of the pieces of equipment Crested Butte was to contribute to Gold-Spor was owned already by Crested Butte and was located in Colorado. Crested Butte claims that the Spors were to specify where this equipment was to be moved to but that they have failed to designate a location. Apparently, Gold-Spor was to have paid for moving this piece of equipment from Colorado. Crested Butte was also required to purchase a second piece of equipment and then contribute it to Gold-Spor. Crested Butte asserts that the Spors were to locate a suitable piece of equipment to be purchased. According to Crested Butte, the Spors failed to fully complete this obligation. Because the equipment has not been contributed, Gold-Spor Mining Company issued no stock certificates to Crested Butte.

Although Crested Butte has not transferred the equipment, it did loan Gold-Spor $125,000 at Gold-Spor's request. The money was used to get Gold-Spor through the first year and to provide the Spors with personal finances. Gold-Spor never executed the required promissory note and did not pledge any stock as security for the loan, as it was required to do.

In May, 1980, the Spors sent a letter to Crested Butte proposing a plan to terminate the Agreement. The plan was not adopted by the parties. Later, on August 18, 1980, representatives of Crested Butte and the Spors met in Salt Lake City. At the meeting the Spors charged that Crested Butte had defaulted on its obligations under the Agreement by failing to contribute the equipment it was required to transfer to Gold-Spor. Crested Butte rejected the assertion on the ground that the Spors had not performed their obligations, and without the Spors' performance, Crested Butte could not complete its obligations.

At the same meeting, the parties discussed Gold-Spor's making early repayment of the $125,000 loan to Crested Butte. John Larsen and Daniel Svilar of Crested Butte attended the meeting and later testified in their depositions that they suggested early repayment of the loan in lieu of Gold-Spor's unfulfilled obligations with respect to the loan. They also testified that only after the loan was repaid would Crested Butte then consider further negotiations to settle or to carry out the rest of the Agreement. They further stated that they fully expected Crested Butte to receive its share of Gold-Spor stock upon transfer of the mining equipment, even after the loan had been repaid. On the other hand, the Spors assert that prepayment of the loan was intended to satisfy all their obligations under the Agreement or, in the alternative, to rescind the entire Agreement, and not just that portion of the Agreement which defined the loan obligations.

Three days after the August 18, 1980 meeting, the Spors were informed by letter

that Crested Butte was ready, willing, and able to perform its obligations under the Agreement if the parties could resolve their differences concerning the equipment. Crested Butte asserted that it was not in breach of the Agreement and had not waived any of its rights under the Agreement. Crested Butte also stated that it awaited the Spors' response regarding Crested Butte's offer "on the prepayment of the loan."

The next correspondence between the parties occurred September 15, 1980, when the Spors' attorney sent a check constituting payment of the interest that had accumulated on the loan. The letter of transmittal stated:

> Enclosed is check No. 164 in the amount of $9,052.43 from Gold-Spor Mining Company payable to Crested Butte Silver Mining Incorporation [sic] which represents the accrued interest on the loan from Crested Butte Silver Mining Incorporated to Gold-Spor Mining Company through September, 1980. My clients will pay $5,000 plus interest on or before November 1, 1980, December 1, 1980, January 1, 1981, February 1, 1981, March 1, 1981, and the remaining balance on or before April 1, 1981.

A notation on the September 15 check stub reads: "Accrued interest at 8% on loan through September 1980." No other notations or comments were made.

Letters sent in October, 1980, disputed when the repayment of the loan was to have been completed according to the terms discussed at the August 18, 1980 meeting. The letters did not, however, state that prepayment of the loan was intended to satisfy all obligations created by the Agreement as the Spors contend, or that prepayment was intended as substitute performance for the obligations to execute a note and to pledge stock as security for the loan as Crested Butte claims. Nevertheless, the Spors thereafter continued to send monthly payments to Crested Butte pursuant to the terms of the September 15 letter. Crested Butte eventually accepted the payments as sent.

According to a letter sent by the Spors' attorney dated May 22, 1981, the loan had been paid in full by that date. The checks, except one, had been deposited and had cleared the bank. The Spors asked that the remaining check be deposited promptly or that Gold-Spor be allowed to issue another in its place. The letter concluded: "Since the full repayment of this loan is the final matter to be taken care of in regard to the Gold-Spor Company matters with Crested Butte, I have prepared and enclosed a Receipt and Release for signature by Crested Butte." The "receipt and release" had already been signed by the Spors and purported to rescind the Agreement with Crested Butte. The consideration stated for the "receipt and release" was the "mutual releases contained herein," and it expressly stated that it would only be "effective upon the execution hereof by all of the parties." Crested Butte did not sign the "receipt and release."

A replacement check was requested by Crested Butte and was issued by Gold-Spor. Along with the replacement check, which Crested Butte cashed, Gold-Spor sent another copy of the "receipt and release," which Crested Butte also declined to sign.

Shortly after the replacement check was received, Crested Butte wrote the Spors and again stated that it was ready, willing, and able to contribute the mining equipment. Crested Butte further demanded that Gold-Spor issue one million shares of stock to Crested Butte. This lawsuit followed.

Based on the foregoing facts, the trial court ruled on a motion for summary judgment that the September 15, 1980 letter from the Spors was an offer to rescind the Agreement and that a rescission or an accord and satisfaction of the entire Agreement occurred when Crested Butte accepted and cashed the loan repayment checks. We hold that the trial court erred.

Summary judgment is a preemptory remedy, and a trial court, in determining whether a material issue of fact exists for the purpose of applying Rule 56, Utah R.Civ.P., in a summary judgment procedure, must view the facts and their infer-

ences in the light most favorable to the party moved against. *W.M. Barnes Co. v. Sohio Natural Resources Co.*, 627 P.2d 56, 59 (Utah 1981); *Rich v. McGovern*, 551 P.2d 1266 (Utah 1976). In cases involving the interpretation of a document or an agreement, "it is not appropriate for a court to weigh disputed evidence concerning such factors; the sole inquiry to be determined is whether there is a material issue of fact to be decided." *W.M. Barnes*, 627 P.2d at 59. "It is of no moment that the evidence on one side may appear to be strong or even compelling, ... documentary evidence is not dispositive if the intent and purpose underlying the documents are at issue." *Id.* Furthermore, the movant must be entitled to judgment under the controlling law if there are no material issues of fact. Our inquiry on review of a summary judgment is similar to the inquiry conducted by the trial court: are there material issues of fact to be litigated, and did the trial court correctly apply the governing law? *Thornock v. Cook*, 604 P.2d 934, 936 (Utah 1979).

Without doubt, the parties agreed to a prepayment of the loan. However, a dispute clearly exists as to whether the prepayment of the loan was intended to satisfy all obligations of both parties under the Agreement.

■ A mutual rescission is like a contract to undo a prior contract. An agreement to rescind a contract must include at least an offer and acceptance and evidence a mutual meeting of the minds to rescind. *Bazurto v. Burgess*, 136 Ariz. 397, 399, 666 P.2d 497, 499 (Ariz.Ct.App.1983). This may take the form of a simple offer and acceptance or a demand followed by an agreement or acquiescence in the demand. *Lowe v. Lym*, 103 Idaho 259, 262, 646 P.2d 1030, 1033 (Idaho Ct.App.1982). The acceptance or acquiescence may also be inferred from the conduct of the parties. *Wallace v. Build, Inc.*, 16 Utah 2d 401, 404, 402 P.2d 699, 700–01 (1965); *Green v. Garn*, 11 Utah 2d 375, 379–80, 359 P.2d 1050, 1054 (1961).

■ Similarly, before an accord and satisfaction can arise, there must also be an offer and acceptance and a meeting of the minds. *Petersen v. Petersen*, 709 P.2d 372, 375 (Utah 1985).

An accord and satisfaction arises when the parties to a contract mutually agree that a different performance than that required by the original contract will be made in substitution of the performance originally agreed upon and that the substituted agreement calling for the different performance will discharge the obligation created under the original agreement.

*Bennion v. LeGrand Johnson Construction Co.*, 701 P.2d 1078, 1082 (Utah 1985). *See also Gold Key Realty, Inc. v. Mantas*, 699 P.2d 730, 732 (Utah 1985); *Sugarhouse Finance Co. v. Anderson*, 610 P.2d 1369, 1372 (Utah 1980).

Crested Butte contends that the prepayment of the loan was only made in relation to the separate, independent covenants concerning the loan and its security, whereas the Spors contend that the prepayment was to have the effect of rescinding the entire contract.

■ The September 15, 1980 letter is not on its face an offer of rescission. That letter merely set forth how and when Gold-Spor would repay the loan. It did not set forth any purpose or intent of the prepayment and as such did not confer upon Crested Butte the power to create a contract to rescind the entire Agreement by accepting and cashing the prepayment checks. If rescission was the intent of the prepayment, that intent must be derived from other evidence in the record.

No other documents indicate that an offer of rescission or of an accord and satisfaction of the entire Agreement was ever made and accepted. The October, 1980 letters merely disputed the time when the payments were to be made and did not contain an offer or state the purpose or intent of the early repayment.

■ The May 22, 1981 letter of transmittal stated, "Since the full repayment of this loan is the final matter to be taken care of in regard to the Gold-Spor Company matters with Crested Butte, I have prepared

and enclosed a Receipt and Release for signature by Crested Butte." That attempt to foreclose Crested Butte from its rights under the contract was made only after the Spors had made full payment on the loan. Indeed, the letter began, "I have been informed ... that the Gold-Spor loan has now been paid in full." This after-the-fact, unilateral effort by the Spors does not satisfy the requirements for either a mutual rescission or an accord and satisfaction.

The wording of the "receipt and release" also supports Crested Butte's claim. Although the "receipt and release" contemplated a complete rescission of the Agreement, the "receipt and release," as well as the letter of transmittal which accompanied it, expressly required the signature of Crested Butte before the document could become effective. The stated consideration for the "receipt and release" was the mutual release of the obligations created by the Agreement and not just the prepayment of the loan. Repayment of the loan was only one independent obligation created by the Agreement. Nowhere in the "receipt and release" is prepayment of the loan referred to as the final performance to be rendered by either party pursuant to the Agreement. Thus, consistent with Crested Butte's version of the facts, the sending of the "receipt and release" may have simply been the first offer of final settlement after the full repayment of the loan.

■ Because disputed material factual issues existed concerning the purpose of the early repayment of the loan, the trial court inappropriately drew inferences as to the parties' intent in deciding the issue on summary judgment. That may not be done in resolving a motion for summary judgment. *W.M. Barnes Co. v. Sohio Natural Resources Co.*, 627 P.2d 56, 59 (Utah 1981).

Reversed and remanded for further proceedings. Costs to appellants.

HALL, C.J., HOWE and DURHAM, JJ., and LEONARD H. RUSSON, District Judge, concur.

ZIMMERMAN, J., having disqualified himself, does not participate herein, RUSSON, District Judge, sat.