2015 UT App 252

## THE UTAH COURT OF APPEALS

STEARNS LENDING INC. AND *GRA LEGAL TITLE TRUST 2013-1*,
Plaintiffs and *Appellee*,

*v.*

SHAUNA PYLE, *ZOHAR SALMAN*, AND *JAY R. MOHLMAN*,
Defendants and *Appellants*.

Opinion
No. 20140250-CA
Filed October 8, 2015

Third District Court, Salt Lake Department
The Honorable Keith A. Kelly
No. 100919606

Chris L. Schmutz, Attorney for Appellants

Elizabeth A. Schulte and Alan S. Mouritsen,
Attorneys for Appellee

JUDGE KATE A. TOOMEY authored this Opinion, in which JUDGES
JAMES Z. DAVIS and STEPHEN L. ROTH concurred.

TOOMEY, Judge:

¶1    Zohar Salman and Jay R. Mohlman (collectively, Appellants) appeal from the trial court's entry of judgment in favor of GRA Legal Title Trust 2013-1 (GRA Legal). The trial court's order invalidated a trustee's deed purportedly conveying to Salman title to a piece of real property. We affirm.

BACKGROUND

¶2    This case has a complicated factual history, and we recite the facts as necessary to understand the arguments raised on appeal. Further, when reviewing an appeal from a bench trial, "we view the evidence in a light most favorable to the trial court's findings, and therefore recite the facts consistent with

that standard." *ProMax Dev. Corp. v. Mattson*, 943 P.2d 247, 250 n.1 (Utah Ct. App. 1997) (citation and internal quotation marks omitted). "However, we present conflicting evidence to the extent necessary to clarify the issues raised on appeal." *Id.* (citation and internal quotation marks omitted).

¶3     Karen Morgan owns a house and real property in Sandy, Utah (the Property). In December 2007, Karen obtained a loan from World Savings Bank, FSB, in the amount of $175,000, which was secured by a trust deed on the Property (the World Savings Trust Deed).

¶4     Sometime later, Karen's husband, Donald Morgan, approached James Sandmire about an opportunity to make $15,000 in a thirty-day period. This prompted Sandmire to encourage his girlfriend, Shauna Pyle, to extend a $75,000 loan to Donald. After negotiations, the Morgans signed a note in the principal amount of $90,000 (the Pyle Note), which included $75,000 cash paid to Donald and $15,000 of "interest" for the thirty-day loan. To secure this loan, Karen, as the sole owner of the Property, executed a trust deed on the Property (the Pyle Trust Deed). The Pyle Trust Deed was recorded in the Salt Lake County Recorder's Office on February 2, 2009, as entry number 10612026. Because Sandmire had a copy of the mortgage statement for the World Savings loan, Pyle and Sandmire understood that the Pyle Trust Deed stood junior to the World Savings Trust Deed.

¶5     The Morgans failed to meet the Pyle Note's deadline for their $90,000 balloon payment. A month later, Pyle, with Sandmire acting as her agent, retained Matthew Howell to start collection efforts against the Morgans. Howell sent the Morgans a demand letter but did not initiate any legal proceedings. At this point, Pyle chose not to proceed with foreclosing the Pyle Trust Deed, recognizing that doing so would mean she would have to pay off the World Savings Trust Deed to own the Property.

¶6    In October 2009, the Morgans began the process of refinancing the World Savings loan so that they could obtain cash to pay Pyle. Knowing that the Morgans had no assets except for the equity in the Property, Pyle was willing to accept a "fraction of the original note" instead of nothing. In addition, she understood that the only way she would receive payment under the Pyle Note would be through the Morgans' refinancing.

¶7    Sandmire directed Inwest Title, which was the closing agent for the refinancing, to ask Howell to provide a payoff amount for the Pyle Note and the Pyle Trust Deed. In response, Howell wrote a November letter to Inwest Title stating that "Pyle will agree to release her trust deed upon payment of approximately $44,000 (i.e., all proceeds of the refinancing not required for the payment of the first mortgage and any fees associated with the refinancing)." This figure was the amount Donald believed he could obtain from refinancing. The letter had no expiration date and was never revoked or rescinded.

¶8    Meanwhile, Zohar Salman developed an interest in purchasing the Pyle Trust Deed. Salman believed that Donald's company, Tab's Trucks, owed him approximately $170,000 related to other business transactions. This alleged unsecured debt was not supported by documentary proof at trial, and Salman did not file a lawsuit to recover it. Nevertheless, Salman believed that if he acquired the Pyle Trust Deed, he could pressure Donald to pay the unsecured debt by threatening foreclosure of the Property. Salman negotiated with Sandmire, who was again acting as Pyle's agent, for the assignment of the Pyle Trust Deed. Sandmire apprised Salman of the Morgans' refinancing efforts and Howell's letter responding to Inwest Title's request for the payoff amount. Salman and Pyle reached an agreement for the assignment of the Pyle Trust Deed on February 1, 2010. Salman then retained Jay Mohlman to represent him and draft documents related to this deal. Both Salman and Mohlman knew the Pyle Trust Deed was the second priority lien against the Property. Mohlman also knew or should

have known that the refinancing was in progress before the assignment was executed.

¶9     Sandmire continued communicating with Inwest Title and with Donald about refinancing the World Savings loan, but did not inform them that Pyle would no longer cooperate in the refinancing or that she was negotiating to assign the Pyle Trust Deed to a third party. In response to an inquiry, Howell sent Inwest Title another letter, stating, "Shauna Pyle will agree to release her trust deed upon payment of approximately $19,000."[1]

¶10     Salman and Pyle executed the assignment of the Pyle Note and the Pyle Trust Deed on February 6 and recorded it on February 18. Howell and Sandmire did not tell Inwest Title about the assignment or indicate that Pyle would no longer accept the $19,000 payoff as stated in the January letter.

¶11     The Morgans closed their refinancing of the World Savings loan on February 9. At the closing, the Morgans executed a note in favor of Stearns Lending Inc. for the principal amount of $232,702 (the Stearns Note). To secure this note, the Morgans executed a trust deed on the Property (the Stearns Trust Deed),[2] which was recorded on February 16. The World Savings loan was paid off with the proceeds of the Stearns loan. And in accordance with the January letter, Inwest Title tendered two checks totaling $33,980.48 (the February Checks) to Howell and specifically stated that they were for the payoff of the Pyle Trust Deed. Inwest Title also sent Howell a notice of intent to

---

1. Except for the letter's January date and the reduction in the amount of the payoff, this letter was identical to the November letter.

2. There is no finding by the trial court identifying whether or when Donald obtained an ownership interest in the Property, but both Morgans signed the Stearns Trust Deed.

reconvey the trust deed. Howell forwarded copies of the February Checks to Mohlman on February 17, and Mohlman understood they were tendered to Pyle as a payoff of the Pyle Trust Deed. The February Checks were not cashed.

¶12  On February 22, Mohlman sent the Morgans a letter notifying them that the Pyle Trust Deed had been assigned to Salman. The letter demanded that they immediately pay $270,000 plus attorney fees and costs, and warned that failure to pay would result in legal action, including foreclosure of the trust deed on their home.

¶13  Shortly thereafter, Mohlman executed a substitution of trustee and recorded a notice of default with intent to sell the Property. He had a copy of the Stearns Trust Deed at the time and knew that the World Savings loan had been refinanced, but did not send a copy of the notice of default or notice of the pending trustee's sale to Stearns Lending.

¶14  In April, Inwest Title tendered Howell the $44,000 payoff amount (the April Checks) set forth in the November letter. The April Checks specified that they were for the payoff of the Pyle Trust Deed. Howell did not return the checks or otherwise indicate that Pyle refused to accept them. Instead, after the statutory period for objecting to the reconveyance expired,[3] Inwest Title recorded a reconveyance of the Pyle Trust Deed on July 21. The April Checks were not cashed.

¶15  A few days before the scheduled trustee's sale, the Morgans' attorney, Paul Halliday, contacted Mohlman to discuss the sale and the payoff of the Pyle Trust Deed. Halliday attended

---

3. The Utah Code provides the procedures for reconveying a trust deed and provides a sixty-day period between the notice of intent to reconvey a trust deed and the actual reconveyance of the trust deed. Utah Code Ann. § 57-1-40 (LexisNexis 2010).

the trustee's sale and tendered two checks to Mohlman as trustee (the July Checks). One check was issued by Inwest Title in the amount of $33,980.48 (the Inwest Title Check) and the other by Zions Bank for $10,000; both checks were made payable to Mohlman as trustee. The Inwest Title Check specifically stated that it was the payoff of the Pyle Trust Deed, which was identified by its entry number: "P/O & Recon SL Co E#10612026." The amount of the Inwest Title Check matched the total of the February Checks.

¶16 Mohlman accepted the July Checks. He endorsed and deposited them around July 29. At the time, Mohlman knew that Inwest Title believed it had an agreement with Pyle regarding the payoff of the Pyle Trust Deed and that Inwest Title had previously tendered $33,980.48 to Howell as a payoff. Mohlman never told Halliday that the July Checks would instead be applied to Donald's alleged unsecured business debt, nor did Mohlman and Halliday make such an agreement. Furthermore, Halliday did not have authorization from Karen, Inwest Title, or Stearns Lending to tender the July Checks for any purpose other than to satisfy the Pyle Trust Deed.

¶17 Despite Inwest Title's reconveyance of the Pyle Trust Deed and his acceptance of the July Checks, Mohlman rescheduled the trustee's sale for September 8. When Halliday inquired about the trustee's sale, Mohlman responded that he would not cancel it unless Donald paid Salman "substantially more" than the amount due and owing under the Pyle Trust Deed. Halliday then demanded the return of the July Checks, but Mohlman refused.

¶18 Mohlman held the trustee's sale of the Property as planned. Salman purported to "credit bid" $100,000 at the trustee's sale, and on September 14, Mohlman recorded a trustee's deed that purported to convey the Property to Salman. In October, Salman began eviction proceedings against the Morgans. Since then, Salman has had possession of the Property

and has received all of its rental income since November 2010, but has not paid for insurance or property taxes. Instead, Stearns Lending and its successor have paid those expenses.

¶19    Stearns Lending filed this action against Pyle, Salman, Mohlman, and Donald and Karen Morgan. It raised a breach-of-contract claim against Pyle and Salman, and generally sought to invalidate the trustee's sale and to ensure the Stearns Trust Deed's senior lien position against the Property. Sometime later, Stearns Lending assigned its interest in the Stearns Trust Deed to GRA Legal.

¶20    After a bench trial, the court awarded judgment to GRA Legal. It determined that Stearns Lending was a good-faith purchaser for value without notice of the assignment of the Pyle Trust Deed. It determined that Salman, in contrast, was not a good-faith purchaser for value. As to the breach-of-contract claim, the trial court determined that the January letter was a valid offer accepted by Stearns Lending when Inwest Title tendered the February Checks to Howell. The trial court then ruled that Pyle breached the agreement with Stearns Lending when she assigned the Pyle Trust Deed to Salman and refused to authorize the release of the Pyle Trust Deed after receipt of the February Checks. Because Salman was Pyle's assignee, the court concluded that Salman was bound by Pyle's agreement with Stearns Lending and was also liable for the breach of that agreement. The court further concluded that Pyle and Salman were estopped from challenging the priority of the Stearns Trust Deed.

¶21    Next, the trial court ruled that the September trustee's sale was void ab initio for several reasons. One stated reason was that the Pyle Trust Deed had been properly reconveyed on July 21. Another was that Mohlman, on behalf of Salman, accepted the July Checks in full satisfaction of the Pyle Trust Deed. Yet another was that Mohlman failed to restart the foreclosure process after he accepted the July Checks.

¶22    Alternatively, the trial court determined that pursuant to the doctrine of equitable subrogation, the Stearns Trust Deed held the senior lien position on the Property because it had assumed the position of the World Savings Trust Deed.

¶23    In accordance with its rulings, the trial court ordered that the trustee's deed purporting to convey the Property to Salman was void. This appeal ensued.

ISSUE ON APPEAL

¶24    Appellants Salman and Mohlman contend that the trial court erred by invalidating the trustee's sale and the trustee's deed that purportedly conveyed the Property to Salman.

ANALYSIS

¶25    Although Appellants raise a number of arguments in support of their appeal, we address only one, which is dispositive. Appellants argue "there was no evidence that [Mohlman] agreed to discount the payoff on the Note and accept the July Checks in full satisfaction of the Note." We understand this argument to be that Mohlman's acceptance of the July Checks did not constitute an accord and satisfaction of the Pyle Trust Deed. We conclude they have not demonstrated error in the trial court's determination that an accord and satisfaction had occurred before the trustee's sale and that the trustee's sale was void ab initio.[4]

---

4. Appellants raise additional arguments on appeal. In particular, Appellants challenge the trial court's several rationales for ruling that the Pyle Trust Deed did not hold the senior lien position on the Property. The position of the Pyle Trust Deed matters only if the Morgans were still obligated

(continued…)

¶26 Appellants essentially contend that the trial court erred in concluding that an accord and satisfaction had occurred. Although we generally review for correctness the trial court's decision that the facts established an accord and satisfaction, *ProMax Dev. Corp. v. Raile*, 2000 UT 4, ¶ 17, 998 P.2d 254, Appellants present their challenge to the trial court's decision as a challenge to the sufficiency of the evidence supporting the factual findings in support of accord and satisfaction. "[A] finding of fact is clearly erroneous if it is without adequate evidentiary support or if it is induced by an erroneous view of the law." *Cove View Excavating & Constr. Co. v. Flynn*, 758 P.2d 474, 477 (Utah Ct. App. 1988). "We will not set aside the trial court's findings unless they are against the clear weight of the

---

(…continued)

under the deed as of September 2010. Because we conclude that the Morgans' obligation under the Pyle Trust Deed was discharged by that time and that Appellants thus were not entitled to foreclose, *see infra* ¶ 34, we need not consider these arguments. Further, Appellants attack the trial court's rulings concerning the validity of the July reconveyance and the foreclosure process leading up to the September trustee's sale. These rulings all served as alternative bases for the court's order invalidating the trustee's sale. Appellants also contend that "there was no contract" to release the Pyle Trust Deed upon payment of $19,000, due to the lack of an offer, acceptance, and a meeting of the minds. The trial court's ruling with respect to the contract claim provided a separate basis for entering judgment in favor of GRA Legal. Accordingly, because we affirm the trial court's order on the independent ground of accord and satisfaction, we need not address Appellants' remaining arguments. *See, e.g.*, *Beehive Brick Co. v. Robinson Brick Co.*, 780 P.2d 827, 833 (Utah Ct. App. 1989) (explaining that "this court need not analyze and address in writing each and every argument, issue, or claim raised" (citation and internal quotation marks omitted)).

evidence or we otherwise reach a definite and firm conviction that a mistake has been made." *Id.*

¶27    "An accord and satisfaction arises when the parties to a contract agree that a different performance, to be made in substitution of the performance originally agreed upon, will discharge the obligation created under the original agreement." *Golden Key Realty, Inc. v. Mantas*, 699 P.2d 730, 732 (Utah 1985). The result is that "[t]he substituted agreement calling for the different performance discharges the obligation created under the original agreement." *Id.* "The obligation discharged may arise out of contract, quasi-contract, tort or some other theory of recovery." *Bennion v. LeGrand Johnson Constr. Co.*, 701 P.2d 1078, 1082 (Utah 1985).

¶28    An accord and satisfaction has three elements. *ProMax*, 2000 UT 4, ¶ 20. The first is the existence of "an unliquidated claim or a bona fide dispute over the amount due," *id.*, or, if the amount due is undisputed, the debtor's incurrence "of a legal detriment in order to confer a benefit" on the creditor, *Sugarhouse Fin. Co. v. Anderson*, 610 P.2d 1369, 1372 (Utah 1980). The second is the debtor's offer of payment "as full settlement of the entire dispute." *ProMax*, 2000 UT 4, ¶ 20. The third is a creditor's "acceptance of the payment as full settlement of the dispute." *Id.* This last element "may be satisfied by [either a] subjective intent to discharge an obligation by assenting to the accord, or conduct which gives rise to a reasonable inference that acceptance of payment discharged the obligation." *Dishinger v. Potter*, 2001 UT App 209, ¶ 22, 47 P.3d 76 (emphasis omitted).

¶29    Appellants vaguely challenge the trial court's findings with respect to the first element by asserting that the amount due on the Pyle Note was "over $100,000." Even so, the trial court's unchallenged findings are sufficient to support a conclusion that the Morgans had incurred a legal detriment to confer a benefit on Salman. *See Sugarhouse*, 610 P.2d at 1372. In particular, the court found that the Morgans refinanced the

World Savings loan and executed the Stearns Note for the primary purpose of obtaining funds to pay the debt on the Pyle Note. *See id.* at 1372–73 (holding that the defendant's negotiation of a loan with a third party that enabled him to pay off the substitute obligation immediately was sufficient consideration to support an accord). Appellants have not demonstrated that these findings are unsupported by the evidence.

¶30 As to the second element, Appellants argue that "[t]he clear weight of the evidence showed that the July Checks did not result in payment in full of the [Pyle] Note." They seem to argue that because the amount due on the Pyle Note was over $100,000 and the July Checks fell short of that amount, the Morgans did not offer payment as a full settlement of the entire obligation under the Pyle Note.

¶31 This argument fails for two reasons. First, the trial court found that the Morgans presented the July Checks for the payoff of the Pyle Trust Deed. The court further found that on the memo portion of the Inwest Title Check, which was attached when Mohlman received it, the notation indicated it was for the payoff and reconveyance of the Pyle Trust Deed as identified by its entry number in the Salt Lake County Recorder's Office: "P/O & Recon SL Co E#10612026." Appellants have not shown that these findings are without adequate evidentiary support. And second, an accord and satisfaction by its nature calls for a substituted performance. *See Golden Key Realty*, 699 P.2d at 732. Thus, the fact that the July Checks were written for an amount less than the $100,000 allegedly due on the Pyle Note does not defeat a finding that the Morgans presented the July Checks as a full settlement of the entire obligation under the Pyle Note, especially in light of evidence that the Morgans and Pyle had been negotiating for months for a payoff very close to the amount tendered.

¶32 As to the third element, Appellants claim there was no evidence that Mohlman "agreed to discount the payoff on the

[Pyle] Note and accept the July Checks in full satisfaction of the Note." The trial court found that Mohlman accepted, endorsed, and deposited the July Checks, which included the notation regarding the payoff of the Pyle Trust Deed. Restrictive wording accompanying a tender of full payment is "one evidentiary fact to be considered with other evidence, if any, in making the factual determination of whether the creditor knew or should have known that the payment was tendered as full satisfaction of an identified obligation of the debtor." *Cove View Excavating & Constr. Co. v. Flynn*, 758 P.2d 474, 477–78 (Utah Ct. App. 1988).

¶33    Here, the trial court's finding that Mohlman accepted the July Checks in full satisfaction of the Pyle Note and the Pyle Trust Deed was supported by several subsidiary findings in addition to the notation on the Inwest Title Check. Specifically, the court found that at the time Mohlman deposited the July Checks, he knew Inwest Title believed it had an agreement with Pyle regarding the payoff of the Pyle Trust Deed. Moreover, the court found that Mohlman knew Inwest Title had previously tendered a check for the same amount as the Inwest Title Check to Howell as payoff of the Pyle Trust Deed. Appellants have not shown that these findings are against the clear weight of the evidence. Consequently, they have not shown clear error in the trial court's finding that Mohlman accepted the July Checks in full satisfaction of the Morgans' obligation under the Pyle Note and Pyle Trust Deed.[5]

---

5. Appellants also argue that the Morgans' behavior after Mohlman deposited the July Checks supports their view that an accord and satisfaction did not occur. Specifically, Appellants assert that if there had been an accord and satisfaction, the Morgans would not have continued negotiating with Mohlman and Salman and would have objected to the trustee's sale on the basis of accord and satisfaction. "The existence of conflicting evidence does not give rise to clear error as long as evidence

(continued…)

¶34   In summary, Appellants have not shown that the trial court's finding that an accord and satisfaction took place is without adequate evidentiary support or against the clear weight of the evidence. *See id.* Because Appellants accepted the Morgans' substitute performance when they deposited the July Checks, the Morgans' obligation under the Pyle Note and the Pyle Trust Deed was discharged through an accord and satisfaction. *See ProMax Dev. Corp. v. Raile*, 2000 UT 4, ¶ 20, 998 P.2d 254. As a consequence, Appellants were not entitled to foreclose on the Pyle Trust Deed, and the trustee's sale of the Property was therefore invalid.

## CONCLUSION

¶35   Appellants have not demonstrated error in the trial court's determination that an accord and satisfaction had occurred before the trustee's sale of the Property and that the trustee's sale was void ab initio. Accordingly, we affirm the trial court's order invalidating the trustee's deed purportedly conveying the Property to Salman.

———————

(…continued)
supports the trial court's decision." *Hale v. Big H Constr., Inc.*, 2012 UT App 283, ¶ 60, 288 P.3d 1046 (citation and internal quotation marks omitted). At most, Appellants have identified conflicting evidence, but they have not established that the trial court's decision is unsupported.