261 P.2d 933

SCOVILLE v. KELLOGG SALES CO.

No. 7824.

Supreme Court of Utah.

Oct. 16, 1953.

E. R. Callister, Jr., Reese C. Anderson, Salt Lake City, for appellant.

Ray, Quinney & Nebeker, Grant C. Aadnesen, Salt Lake City, for respondent.

HENRIOD, Justice.

Appeal from a judgment entered on a directed verdict of no cause of action in a suit by plaintiff claiming breach of an employment contract. Reversed and remanded for a new trial, with costs to plaintiff.

Plaintiff attacks the 1) granting of the motion for directed verdict, 2) the striking of one Borsum's testimony on the lower court's ground that as a matter of law he was not an authorized representative of defendant company, and 3) the striking of certain evidence as violating the parol evidence rule.

We must view the evidence in a light most favorable to plaintiff, the victim of the directed verdict.[1] Doing so, we find that Scoville, a man now in his middle sixties, has been a salesman for the defendant since 1944. In 1947 he sold defendant's turkey feed in the West, where company sales had been few in the past. In *January, 1948,* by Bulletin, and for the first time, the company established a $2 per ton bonus, less salary and expenses, stating "we will look at the situation *at the end of 1948,* and see if this is the best possible bonus arrangement, both from the standpoint of the individual salesman and the Kellogg Company."

Scoville, as was customary, began selling feed in the fall of 1948 for consumption in 1949. In November 1948, Scoville and Borsum had a conversation, Scoville estimating his 1949 business at 500 cars of feed, and Borsum expressing doubt as to such volume, but stating, when reminded that Scoville's bonus would amount to $30,000, that he saw no reason why the bonus should be changed at that time and that nothing would be changed in the 1949 setup.

Thereafter Scoville worked harder than ever and sold considerable feed, such that in April, 1949, he asked Borsum and Williams (an admitted agent of the company) if they thought he had sold enough feed, whereupon Williams urged him to sell all he could. When Scoville suggested he would make considerable money under the bonus, Williams replied: "We have got money to pay the bonus, you sell the feed." By July 1, 1949, Scoville had closed all his sales for the year. He claims and defendant denies that an agreement was consummated incorporating the bonus terms of 1948 in an agreement for 1949.

Shortly after he had made his last sales, and in mid-July, Scoville received a "Bonus Plan for 1949" *which was signed by Borsum,* scheduling a bonus far below that of 1948. Scoville acknowledged its receipt, expressed concern over the plan, but at that time specifically did not accept or reject its terms. Some slight evidence indicates that he complained orally several times. At any rate he protested to Borsum in January, 1950, being told he should make no trouble, else he, Borsum and Williams all would lose their jobs. In this same month, the company notified its salesmen there would be no

1. Finlayson v. Brady, Utah, 240 P.2d 491; Gibbs v. Blue Cab, Inc., Utah, 249 P.2d 213.

bonus for 1950, but Scoville's salary would be raised. It may or may not be significant that in the 3 years when it was considered, the bonus was fixed in *January*, 1948, in *July*, 1949, and abolished in *January*, 1950. The record is silent as to why a bonus was set so. early in 1948 and so late in 1949. Scoville denies that he assented to the terms of the "Bonus Plan for 1949." Defendant says he did.

Scovillé had been ill prior to his conversation with Williams and Borsum in January, 1950, and in February, on doctor's order, he went to Arizona, returning in April, during which time his wife attended to his business. There is evidence that he was hospitalized later for a time.

On January 30, 1950, the company sent Scoville a check "to cover bonus for 1949." The check was returned for deduction of withholding tax which the company had overlooked. A corrected check was sent with a letter stating that a complete adjustment would be made when Mrs. Scoville's figures were received. On April 25, 1950, the company forwarded another check for $1,026.88, along with a letter *signed by Borsum,* stating that it represented "the balance due on your bonus for 1949." The amounts of both checks were calculated on the schedule of the "Bonus Plan for 1949," and both were cashed without protest. Scoville thereafter made no formal protest until the eve of his retirement at the end of 1950, when he wrote the assistant to the president of the company. Defendant claims there was an accord and satisfaction, an account stated, or an estoppel. Plaintiff claims the facts prove otherwise, and that there was a jury question.

■ It was error to strike Borsum's testimony on the ground he did not represent the company. The only basis for such ruling was the fact that when asked *at the trial* who was his employer, he answered it was the Kellogg Company, an answer having no probative value as to his status many months before. The very contract which the company relies on was signed by Borsum, and the purported final bonus payment made to Scoville, and which the company claims was an account stated or an accord and satisfaction, was forwarded *by Borsum* with a letter in which he asserted that the payment was the balance due. Under such circumstances, Borsum's relationship to the company would appear to have been one of agency but at least it was a jury question.[2]

■ Defendant urges that the trial court did not err in striking as inadmissible under the parol evidence rule, all statements made prior to issuance of the "Bonus Plan for 1949," whether they had resulted in agreement or not, since they were merged in the later agreement. Such contention assumes the most important fact in this case,— whether Scoville accepted the terms of the "Bonus Plan for 1949." The facts most fa-.

2. 2 Am.Jur. 359, § 454.

vorable to plaintiff are not such as would require all reasonable minds to conclude that there was such an acceptance, hence whether Scoville's actions were such as to constitute an acceptance also was a jury question.

■■ The same conclusion holds as to whether his actions constituted an accord and satisfaction, and agreement to settle disputed claims, based on a consideration,[3] or as to whether his actions bound him to an account stated,[4] balancing accounts, and failing to overcome the rebuttable presumption that he would be bound for lack of protest within a reasonable time.[5]

■ We believe and hold that the facts of this particular case entitled plaintiff to go to the jury on his theory of the case,[6]— that he had a contract to get a $2 per ton bonus as he did in 1948, and that defendant was entitled to go to the jury on its theory of a different agreement, and on its defenses of accord and satisfaction and account stated. As to the estoppel claimed by defendant, it is difficult to find in the record any representation knowingly · made by plaintiff, upon which he intended defendant to rely and which the defendant, having done so, acted to its legal detriment.[7]

CROCKETT and WADE, JJ., concur.

WOLFE, Chief Justice (dissenting).

I dissent. Taking the evidence most favorable to the plaintiff, it is clear that reasonable minds could not find that the defendant, through its alleged agents, made an offer to the plaintiff to continue the 1948 · bonus plan through the year 1949. To the contrary, reasonable minds could only conclude that the only offer made by the defendant to the plaintiff for the year 1949 was the bonus plan of 1949 sent in writing to the plaintiff in July or August 1949 and that the plaintiff accepted that offer. A more complete statement of the evidence than that contained in the majority opinion will make this evident.

Plaintiff testified that on August 15, 1944, he was employed as a feed salesman and serviceman by defendant. In March, 1947, he was transferred from an eastern to the western territory of the company for the purpose of conducting there fur-feed business on its behalf. He was paid a salary, given expenses and furnished an automobile. He further testified that in April of 1947 he was requested by the production manager of defendant's Omaha plant to undertake to sell turkey feed processed by that plant. He did so, selling about 100

---

3. Ralph A. Badger & Co. v. Fidelity Building & Loan Ass'n, 94 Utah 97, 75 P.2d 669; 1 Am.Jur. 215, § 1.

4. 1 Am.Jur. 272, § 16.

5. Benites v. Hampton, 3 Utah 369, 3 P. 206; 1 C.J.S. Account Stated, § 37, page 715.

6. A. W. Sewell Co. v. Commercial Casualty Ins. Co., 80 Utah 378, 15 P.2d 327.

7. Black's Law Dictionary, Third Edition.

carloads of feed during the remainder of that year. In late January 1948 he received the following bulletin:

> "Bulletin 148–3
> Omaha, Nebraska
> January 29, 1948

"FIELD SERVICEMEN:

"As we discussed in our meeting at Battle Creek, the bonus plan for 1948 will be as follows. We will credit your account on the basis of $2.00 per ton allowance on all feed including Sweet Mix Pellets, but not including Hominy feed, and charge against your account what is paid to you in the way of salary, expenses, operation of the car and your living expenses, but not including automobile depreciation. At the close of 1948 whatever amount is over will be paid at the end of that year.

"Of course this means that we will look at the situation at the end of 1948 and see if this is the best possible bonus arrangement, both from the standpoint of the individual salesman and the Kellogg Company.

> "W. H. Williams, Jr.
> Sales Manager
> Mixed Feed Dept.
> Omaha Plant
> (signed)    W. H. W. Jr.

"WHW :mc"

Plaintiff testified that to the best of his knowledge he had worked under no bonus or commission arrangement prior to this time. He further stated that under the impetus of the 1948 bonus bulletin he enlarged the turkey feed business of the defendant in its western territory. He testified that he sold the feed under a company plan called the "turkey finance" program and that his task was to "Call on * * * dealers and consumers that use the feed." Under this plan the turkey growers entered into an agreement with the company whereby the company agreed to finance the feed for turkeys raised by the farmers. Estimates of the consumers' needs would be set out in the contract. The record is not clear but apparently plaintiff as a traveling contact man for defendant had a two-fold task: (1) He himself sold turkey feed to ultimate consumers, obtaining their signatures on the requisite contract forms; (2) He furnished jobbers and dealers with the necessary forms and the jobbers directly, or through their dealers, and the dealers with no jobber contacts would obtain the requisite signatures on the turkey finance program contract forms. After the necessary signatures were obtained on the contracts of purchase, the contracts were sent to Omaha for approval by the company. Plaintiff testified that as the turkey season progressed Omaha would be notified by a jobber or himself as to the time and place to ship the feed contracted for. He testified that he started negotiating for 1949 contracts with the farmers during the fall of 1948 and that contracts entered into in 1948 for 1949 feed would be added to 1949 business.

Plaintiff testified that on November 4, 1948 he, Mrs. Scoville and Mr. L. C. Borsum, purported agent (U. S. Sales Manager) of defendant had breakfast together in Portland, Oregon. He further testified as follows:

"A. Well, I had sent Mr. Borsum a letter on what I figured I would do in the year 1949 and he asked me if I honestly thought I would sell 500 cars of feed and I told him the figures absolutely showed that way.

"And he said, 'That is a lot of feed.' I said: 'I know it, and it is going to mean a lot of hard work,' and I said: 'With the bonus figured the way they are now, I am also going to make a lot of money, around $30,000.00.'

"He said: He 'didn't see any reason why the bonus should be changed at that time, there was nothing that should be changed in the set up, for 1949.' "

Plaintiff testified that on April 16, 1949 he, Mrs. Scoville, Mr. L. C. Borsum and Mr. W. H. Williams, an employee of the Kellogg Sales Company, were in plaintiff's Omaha, Nebraska, hotel room. He further testified as follows:

"A. I asked both Mr. Borsum and Mr. Williams, if they thought I had enough turkey contracts in this territory. And Mr. Williams stated I should go ahead and sell all the contracts I could. He could make the feed. He was in charge of the Omaha Plant.

"I said: 'you are also going to pay me a lot of bonus too.' He said: 'We have got money to pay the bonus, you sell the feed.

\* \* \* \* \* \*

"I said: 'Bill [apparently W. H. Williams], it will take a lot of feed and I will get a lot of bonus, it is pretty near time to shut off out there.'

"He said, 'We will take care of you, Kellogg has got plenty of money and we will make the feed.' "

Plaintiff in addition testified that in July or August 1949, just after a sales meeting in Omaha, Nebraska, held a few days before a new bonus plan (hereafter set out) was sent out he had the following conversation with Mr. L. C. Borsum:

"A. I asked Mr. Borsum if it was going to make any difference with my territory, as I was told several times my territory operated different than anything back there.

"He said, 'No, we will work that out, whatever change is made I will let you know.'

"And he said: 'I don't think it will make a bit of change, Ray, in your set up.' "

On July 24, 1949, plaintiff wrote a letter to Mr. L. C. Borsum (apparently in response to one sent by Borsum to him) the material portion of which reads as follows:

"Also. your letter of July 11th, regarding the bonus plan, which of course is very important to me, I have read it very carefully, but I am not ready to give you my thoughts on it, for my feed business is practically assured * * from the start. And from the wording of this letter I can see where it could be changed to where I would not get any bonus."

On August 2, 1949 Mr. Borsum wrote to plaintiff stating:

" * * * * * *

" 'Credit Toward Bonus

" 'First 2,000 tons of financed feed sold (hog, cattle, turkey and poultry)      .50 per ton allowance
Balance of financed feed sold      1.00 per ton allowance
All non-financed feed sold      2.00 per ton allowance

" 'Against your bonus credit will be charged your territory expense and salary. We feel that the above bonus plan is an equitable one as far as the company and the salesmen are concerned, especially when you consider that most of the salesmen in the feed department are now members of the Kellogg Sales Company savings plan and participate in the profits of the company.

*     *     *     *     *     *

" 'The above bonus plan covers 1949 operations only.

" 'Feed Department
Battle Creek, Michigan
(signed) L. C. Borsum' "

"With further reference to the bonus plan for 1949, you are practically assured of one and a good one at that."

Sometime in July or early August plaintiff received a bulletin captioned "Bonus Plan for 1949" which reads as follows:

" *     *     *     *     *     *

"The bonus plan covered in Bulletin #148–3 dated January 29, 1948 expired as of December 31, 1948. The bonus plan for 1949 which we feel is fair to all concerned is as follows:

Plaintiff was asked by his counsel, "Now, after receiving that bulletin, Exhibit B, did you enter a protest or talk with any of the officials of the company?" He answered, "Not at the—I wrote them a letter at that time but there was nothing more said about it."

On January 9, 1950, plaintiff, at a Turkey show in Minneapolis, Minnesota, had occasion to talk with Mr. L. C. Borsum concerning the new bonus schedule. Plaintiff testified as follows:

"Mr. Borsum told me I would have to follow the new schedule of the bonus which was issued in August, that he had sent out, and that he didn't think it was a good thing that I should make any trouble about it or say anything,

or discuss it, because that is the way it was and that is the way it had to be.

"That if anything was said, if I took it up with the higher ups both him and Mr. Williams and myself would all lose our jobs, and if I kept my mouth shut I could stay on indefinitely as long as I was doing the job."

January 10, 1950, plaintiff received the following letter signed by W. H. Williams, Jr., General Sales Manager, Omaha Branch, Kellogg Sales Company:

" *     *     *     *     *     *

"Dear Ray:

"We are discontinuing bonus plan which was in effect and we will not have a bonus plan for 1950. We are advancing your salary, effective January 1, 1950 from $325.00 to $375.00 per month. This will confirm our recent conversation.

*     *     *     *     *     * "

On January 30, 1950, Mr. Williams of the Kellogg Sales Company wrote to plaintiff as follows:

"Please find enclosed our check in the amount of $3544.35 to cover bonus for the year 1949. * * *

"It was necessary to go ahead and clean this matter up based on the figures we have, but subject to revision, if the figures you are sending prove ours to be incorrect. We will appreciate having you forward Helen's figures [plaintiff's wife who kept his files,

books and records] as soon as possible so we can check this out, but we did have to close our books for 1949 and that is the reason for going ahead and making the calculation."

The check was figured on the 1949 payment schedule. Plaintiff returned the check to Omaha because no withholding tax had been deducted. Mr. Williams acknowledged receipt of the returned check and informed him that the Battle Creek office would send the check less withholding tax. In addition Williams wrote:

"We are in the process of checking Helen's figures on shipments and will make a complete adjustment as soon as those figures have been audited."

On February 6, 1950, a check in the amount of $2,981.92 was drawn by the Kellogg Sales Company in favor of plaintiff. (This represented the original check sent by Williams less the withholding tax.) This check was received, endorsed and cashed by plaintiff. On April 24, 1950, a check for $1,026.98 was drawn by the Kellogg Sales Company in favor of plaintiff. It was sent to him with a letter which contained the following statement:

"Attached find check in the amount of $1,026.88 representing the balance due on your bonus for 1949."

Plaintiff received, endorsed and cashed the check.

On December 30, 1950, about 17 months after the receipt of the 1949 bonus bulletin,

and two days prior to his "retirement," plaintiff sent a letter to a Mr. Lyle C. Roll, an official of the Kellogg Company in Battle Creek, Michigan, a portion of which is set out below:

"On January 29, 1948 Bulletin #148–3 was sent out and signed by Mr. W. H. Williams, Jr. from the Omaha office telling all field servicemen that they would be paid a $2.00 per ton allotment on all feed including Sweet Mix Pellets, (but not including hominy feed). Less the expense of the territory. This bonus plan was not changed until July 1949, at which time my feed was practically all sold for 1949, and this letter was sent out by Mr. L. C. Borsum saying the company had changed their minds regarding the 1948 bonus plan, and making this change retroactive to January 1st, 1949. Now Mr. Roll, I had talked with both Mr. Williams and Mr. Borsum several times regarding how this would effect [sic] me, and each told me it made absolutely no difference as long as I sold the feed, but especially in April of 1949 did I discuss this with them at a sales meeting in Omaha, and was assured again that it made no difference, that I would get the $2.00 per ton bonus on all feed I sold that year. And at that time I gave them approximately what the figures for the year 1949 would be."

The letter then runs through various figures and concludes that there is an amount yet due to plaintiff from the company. Mrs. Scoville testified that the contracts were all written and signed prior to July 1, 1949, and were sent to Omaha and were accepted and approved by Omaha prior to that date.

Mr. Leslie Carl Borsum was called as an adverse witness for plaintiff under Rule 43 (b) Utah Rules of Civil Procedure. He testified that he was employed by the Kellogg Company (not Kellogg Sales Company, defendant), and that Mr. Scoville was paid his bonus for 1949 in accordance with the 1949 bonus plan.

It should be noted that the very words of the bulletin of January 29, 1948, state that "the bonus plan for *1948* will be as follows:" (italics mine.) That bulletin contains nothing which would justify the assumption that it would continue through 1949; on the contrary it expressly states that it will be re-examined at the end of 1948. Plaintiff contends, however, that certain conversations heretofore narrated which the trial court struck from the record provide an evidentiary base from which it could be reasonably concluded that the alleged agents of the defendant represented to the plaintiff that the bonus plan for 1948 would continue through 1949 or that the bonus plan for 1949, although created anew, would be identical to that of 1948. I find nothing in that evidence which was struck which permits such a conclusion to be drawn. The majority opinion states that in

November, 1948, Borsum, in a conversation with the plaintiff, stated "that he saw no reason why the bonus should be changed at that time and that nothing would be changed in the 1949 setup." That is not Mr. Borsum's statement. The plaintiff's testimony as to what was said by Mr. Borsum at that time has been heretofore set out in full in this opinion. It was that Borsum "didn't see any reason why the bonus *should* be changed at that time, there was nothing that *should* be changed in the setup, for 1949." (Italics added.) Borsum was not representing what the plan would be. His very language is prospective. He was a sales manager who was attempting to install optimism and incentive in one of his salesmen. His statements did not constitute an offer and could not have reasonably been so understood by the plaintiff. The subsequent actions of the plaintiff reveal that he did not consider the oral and written statements of Borsum and Williams to be offers but only optimistic expressions as to the plan which would finally be offered by the defendant company. Up until the time the 1949 bonus plan was presented in July or August 1949, the plaintiff, Borsum and Williams looked forward to the presentment of the bonus plan. Witness the plaintiff's conversation with Borsum in July or August 1949 in Omaha just shortly before the 1949 bonus plan was presented. At that time the plaintiff asked if the new bonus plan "was going to make any differ-ence with my territory." Such a question would not be asked by a man who already had a contract for a bonus on the same terms as in 1948.. When the plan was presented, it was a disappointment to the plaintiff and did not measure up to his expectations nor to the optimistic talk of Borsum and Williams. But the conclusion is inescapable that the plaintiff nevertheless accepted the offer: (1) He received and acknowledged receipt of the bulletin; (2) he continued to work for the defendants; (3) he made no serious protest to the defendant until approximately 17 months after the receipt of the bulletin; (4) he failed to protest the figures of an account rendered to him in the early part of 1950; such account setting forth the remaining amount owed to him by the defendant and such figures being based on the 1949 bonus schedule; (5) he received, endorsed and cashed two checks given to him by the defendant in payment of the 1949 bonus. The last check was enclosed with a letter which stated: "Attached find check in the amount of $1,-026.88 representing the balance due on your bonus for 1949." No other conclusion is reasonable from these actions by the plaintiff other than that he accepted the only offer made to him, viz.: the 1949 bonus plan sent out in July or August of 1949. Thus even if we consider the conversations which the trial court struck from the record, and assume that from such conversations it can be reasonably inferred that the

defendant made an oral offer which was accepted by the plaintiff prior to July, 1949, the acceptance of the 1949 bonus plan created a valid and subsisting contract which superseded and displaced any prior existing oral contract. Evidence of a prior oral contract would be correctly excluded under the parol evidence rule. The law is basic that if the parties have stated the terms of their contract in the form of a written integration, it cannot be varied or contradicted by proof of antecedent negotiations and *agreements.* Corbin on Contracts, § 573, p. 221.

The majority opinion holds that it was a jury question whether there had been an accord and satisfaction. I cannot agree with that holding. Corbin on Contracts, § 1279, Vol. 6, p. 97, states:

"Where the amount due is in dispute, and the debtor sends cash or check for less than the amount claimed, clearly expressing his intention that it is sent as a settlement in full, and not on account or in part payment, the retention and use of the money or the cashing of the check is almost always held to be an acceptance of the offer operating as full satisfaction, even though the creditor may assert or send word to the debtor that the sum is received only in part payment. The creditor's action in such case is quite inconsistent with his words. It may,

indeed, be clear that he does not in fact assent to the offer made by the debtor, so that there is no actual 'meeting of the minds.' But this is merely another illustration of the fact that the making of a contract frequently does not require such an actual meeting. * * * It has seemed to the courts more beneficial to hold that the creditor's action speaks louder than his words and is operative as an acceptance of the offer as made.

"The cashing, or the certification, of a check expressly sent in full settlement of a disputed claim, operates as an accord and satisfaction if, at the time, no word of dissent is sent to the party offering it in satisfaction.

"In these cases it is held that it makes no difference that the creditor did not know that the effect of his cashing the check or keeping the money would be the discharge of his entire claim. This is supported by fundamental legal doctrine. The acceptance of an offer makes a contract even though the parties do not know the law or the legal consequences of their agreement."

In the instant case, the amount owed to the plaintiff by the defendant was in dispute. On February 6, 1950, and again on April 24, 1950, plaintiff accepted and cashed checks in payment of his bonus computed according to the terms of the 1949 bonus

plan. The last of these checks expressly stated that it represented the "balance due on your bonus for 1949." Eight months later the plaintiff made his first real complaint. When the majority opinion states that under these facts it was a jury question as to whether there was an accord and satisfaction, it is allowing the jury to determine a question of law. The majority opinion leaves to the jury the task of determining the legal effect of the acceptance of the checks. That matter is a question of law and under the authority cited above, it is clear that there had been an accord and satisfaction.

I do not approve of the practice of the defendant in waiting until July or August of 1949 before informing its salesmen as to the amount of the bonus for that year. By that date, all or nearly all the selling had been done for that year. I do not doubt that the plaintiff was extremely disappointed when he learned the terms of the 1949 bonus plan. But he had no contract with the defendant to pay him a bonus on the same terms as in 1948, and I cannot torture one out of optimistic sales talk in order to salve his keen disappointment.

I would affirm the action of the lower court.

McDONOUGH, J., concurs in the views expressed in the dissenting opinion of WOLFE, C. J.