2023 UT App 54

# THE UTAH COURT OF APPEALS

MAGLEBY CATAXINOS & GREENWOOD PC, JAMES MAGLEBY,
MAGLEBY & GREENWOOD PC, AND PEGGY A. TOMSIC,
Appellees,
*v.*
ERIC K. SCHNIBBE,
Appellant.

Opinion
No. 20210591-CA
Filed May 18, 2023

Third District Court, Salt Lake Department
The Honorable Randall N. Skanchy
No. 200902977

Jefferson W. Gross, S. Ian Hiatt, and J. Adam
Sorenson, Attorneys for Appellant

James E. Magleby, Bryon J. Benevento, and Kimberly
Neville, Attorneys for Appellees

JUDGE RYAN M. HARRIS authored this Opinion, in which
JUDGES RYAN D. TENNEY and AMY J. OLIVER concurred.

HARRIS, Judge:

¶1     In 2016, the Magleby Cataxinos & Greenwood law firm received a massive contingency fee related to the firm's work in a trade secrets case. A dispute arose between the firm and lawyer Eric K. Schnibbe about what Schnibbe's share of that fee ought to be. The firm, via direct deposit, put $1 million (less withholdings) into Schnibbe's bank account, and asked Schnibbe to sign a release of all claims against the firm and its principals. Schnibbe refused to sign the release, but kept the money and continued to work at the firm. After the dispute later came to a head, the firm (and its principals) and Schnibbe sued each other, and the district court later entered summary judgment in the firm's favor, determining

that there had been an accord and satisfaction, and that Schnibbe's claims failed for other reasons as well. Schnibbe now appeals, and we affirm on the basis that, under Utah law as applied to the circumstances presented here, the elements of accord and satisfaction are met as a matter of law.

## BACKGROUND

¶2 In the mid-2000s, attorney Peggy Tomsic began representing USA Power LLC in a trade secret and legal malpractice dispute against PacifiCorp and others (the USA Power Case). Schnibbe joined Tomsic's firm in 2006 and began to assist Tomsic on the case. Tomsic's firm was working on the case under a contingency fee agreement entitling it to a percentage of any recovery. In 2007, the trial court presiding over the case dismissed it on summary judgment, and USA Power appealed.

¶3 In 2009, while this first appeal was pending, Tomsic joined the Magleby law firm (the Firm),[1] and she brought the USA Power case with her. She recommended that the Firm hire Schnibbe too; he joined the Firm in 2010 as an associate and was paid a monthly salary as an at-will W-2 employee.

¶4 In 2010, the Utah Supreme Court ruled that the trial court had erred by granting summary judgment against USA Power, and therefore reinstated the case and remanded it for trial. *See USA Power, LLC v. PacifiCorp*, 2010 UT 31, ¶ 71, 235 P.3d 749. At that point, Tomsic and the Firm's lead partner, James Magleby,

---

1. At the time Tomsic joined the Firm, it was known as "Magleby & Greenwood, PC," but in 2015 it changed its name to "Magleby Cataxinos & Greenwood, PC." For convenience, and because the change in the Firm's name is not material to the issues raised in this appeal, we use the phrase "the Firm" to refer to the Magleby law firm generally, in either iteration.

agreed that any fee relating to the USA Power Case would be split 60/40, with Tomsic to get sixty percent and the Firm forty percent.

¶5   Soon thereafter, Magleby and Tomsic considered the question of how much of the fee Schnibbe would be entitled to receive. In March 2011, after some discussion, Magleby sent an email to Tomsic stating that he "wanted to close the loop on our discussion about [Schnibbe]" and "confirm that 10% is the right number" for him. Attached to the email was a spreadsheet—labeled "E. Schnibbe USA Power contingency"—that contained what Magleby described as "hopefully . . . roughly accurate numbers" that they "could work with" in figuring out Schnibbe's share of the fee. The spreadsheet estimated their client's recovery at $73 million, the total fee available to Tomsic and the Firm at just over $20 million, and Schnibbe's share at exactly ten percent of that fee—just over $2 million—with no cap.

¶6   Some time later, in the spring of 2011, Magleby and Tomsic met with Schnibbe (in a meeting we refer to as "the Spring 2011 Meeting") to discuss the fee and other matters. As Schnibbe remembers it, Magleby told him that, if there was a recovery in the USA Power Case, Schnibbe would receive a maximum of 10% of the fee, with no cap if the recovery were "larger than expected," but that Schnibbe's share of the fee would be capped at $1 million if the recovery were modest. Magleby—who apparently drove a Bentley at the time—colorfully stated that, if the recovery were large, the cap would not apply and that there would be enough money for "Bentleys for everyone!" But the meeting included no discussion of what the Firm's expectations were regarding the fee, and no discussion of any specific number above which the $1 million cap would be lifted. And there was never any further discussion, after the Spring 2011 Meeting, regarding any specific number above which the cap would be lifted.

¶7   Also in the spring of 2011, Magleby informed Schnibbe that he would be allowed to use the designation "partner" for marketing purposes, and that he would become a "Tier 2 partner" under the Firm's compensation policy. But this designation did

not mean that Schnibbe became an owner in the Firm; he was still to be paid a salary pursuant to the Firm's compensation policy, and he was still to remain a W-2 at-will employee of the Firm. At all relevant times, Magleby was the Firm's only equity shareholder, and all other Firm lawyers—including Tomsic—were W-2 employees paid according to the Firm's policy or separate contractual arrangements.

¶8 In 2012, the USA Power Case finally went to trial, and a jury found in favor of USA Power and determined that it had sustained more than $133 million in damages. Following post-trial motions, the court reduced the verdict by some $21 million. In the weeks after trial, Magleby and Tomsic exchanged emails regarding Schnibbe's share of the fee; to one email, Magleby attached another spreadsheet showing a $1 million payment to Schnibbe, but stated in the body of the email that "you and I know that we may go above $1 million, depending upon what happens." And in post-trial filings about attorney fees, the Firm described Schnibbe as a "partner" who had been an "essential part of our trial team." Following the post-trial rulings, both USA Power and PacifiCorp appealed to the Utah Supreme Court.

¶9 In May 2016, the Utah Supreme Court affirmed the trial court's rulings and the award of damages, which (with accrued interest) ended up being more than $122 million. *See USA Power, LLC v. PacifiCorp*, 2016 UT 20, ¶¶ 83, 95–97, 109, 372 P.3d 629. Shortly thereafter, PacifiCorp paid the judgment in full, resulting in Tomsic and the Firm receiving a fee that Schnibbe estimates to be about $55 million.

¶10 In late May 2016, Magleby emailed Firm employees to explain that bonuses would be awarded to those who had been working at the Firm while the USA Power Case was active and that "everyone who is going to get a payment will need to sign a release." About a week later, Magleby emailed a handful of attorneys, including Schnibbe, a "Generic Bonus Employer Shortened General Release" (the Release) and asked the attorneys to "please sign and return after you get the dough." The Release

recited that the Firm had recently settled the USA Power Case, "resulting in the [F]irm's recovery of a contingency fee payment," and that the Firm was "prepared to make a payment" to the employees in question, including Schnibbe, "based upon the recovery in this case." The Release further stated that employees who "sign (and do not revoke)" the Release will receive a payment "on or before the next regular pay period." By signing the Release, employees would acknowledge that they have accepted the payment provided and that they "have been fully compensated . . . for the promises and releases made" in the Release. Finally, employees who signed the Release would "unconditionally release[]" the Firm and its principals "from any and all claims . . . that arise out of or related to" their employment.

¶11 In early June 2016, without Schnibbe having signed the Release, the Firm directly deposited, in two equal installments, an amount totaling $1 million (less withholdings) into Schnibbe's bank account.[2] Given Schnibbe's belief that he was to receive 10% of the fee, and his understanding that Tomsic and the Firm had received a fee of some $55 million, Schnibbe believed that he was entitled to a payment of $5.5 million. He therefore viewed the $1 million payment as falling well short of what the Firm owed him, and on that basis refused to sign the Release.[3] But Schnibbe did not take any steps to return the money deposited in his account, nor did he immediately express any dissatisfaction about the

---

2. The total amount actually deposited into Schnibbe's account was something less than $600,000.

3. Given the procedural posture of this case, we view this fact in the light most favorable to Schnibbe. *See Feasel v. Tracker Marine LLC*, 2021 UT 47, ¶ 17, 496 P.3d 95 (stating that appellate courts "review the facts in a light most favorable to the party against whom summary judgment was granted" (quotation simplified)). We recognize that the Magleby Parties take the position that Schnibbe might have signed the Release. The record submitted to us, however, does not contain a signed Release, and we therefore assume, for purposes of this appeal, that Schnibbe did not sign it.

payment to Magleby or Tomsic.[4] Instead, he kept the money and remained employed at the Firm, apparently deciding to take a "wait-and-see" approach; as he later put it in his counterclaim, "he took the $1,000,000 knowing he had time to seek recovery of the rest of his compensation later."

¶12    About two years later, in March 2018, Magleby became "frustrated" with Schnibbe for missing an internal deadline in another case, and told him so in an email. In a response email, Schnibbe raised the USA Power Case contingency fee issue for the first time since the payment, accusing Magleby and Tomsic of "reneg[ing] on the USA Power deal." In a follow-up conversation the next day, Schnibbe expressed to Magleby that he was dissatisfied with the payment he had received in 2016, and that he believed the $1 million cap should not have applied to that payment. Magleby responded that he did not remember the conversation from the Spring 2011 Meeting the same way. Magleby and Schnibbe were not able to resolve the dispute during that conversation, and neither side took any action around the issue for another two years.

¶13    In the spring of 2020, Magleby informed Schnibbe that, due to work performance concerns including a recent drop in Schnibbe's billable hours, the Firm would be reducing Schnibbe's salary by ten percent. Schnibbe responded by expressing his displeasure in emails that Magleby considered "increasingly hostile" and "combative." In those emails, Schnibbe again referred to his continuing disappointment about the USA Power Case payment he received in 2016. After reviewing these emails, Magleby concluded that he could no longer personally work with Schnibbe and, because Magleby provided Schnibbe most of his work, Schnibbe would have little work to do at the Firm if

---

4. Schnibbe did, however, complain to another lawyer at the Firm around the time he received the money, but he did not ask that lawyer to take any action with regard to the matter.

Magleby did not work with him. For these reasons, in April 2020, Magleby fired Schnibbe.

¶14    Shortly thereafter, both sides sued each other. The Firm, Magleby, and Tomsic (the Magleby Parties) filed a complaint against Schnibbe, claiming that Schnibbe had breached an agreement with the Firm and seeking (among other things) return of the $1 million the Firm had paid Schnibbe. A few days later, Schnibbe filed a separate lawsuit against the Magleby Parties, asserting claims for breach of fiduciary duty, breach of contract, promissory estoppel, unjust enrichment, and constructive trust. Schnibbe's suit was later consolidated into the Magleby Parties' suit, with Schnibbe's claims re-styled as counterclaims. The Magleby Parties moved to dismiss Schnibbe's counterclaims, but the court denied the motion.

¶15    About a year later, after completion of discovery, the Magleby Parties filed a motion for summary judgment on Schnibbe's counterclaims. Following briefing and oral argument, the district court granted the motion, concluding that all of Schnibbe's counterclaims were barred by the doctrine of accord and satisfaction. In addition, and alternatively, the court concluded that each of Schnibbe's counterclaims also failed for other reasons: as the district court saw it, his fiduciary duty claim failed because Schnibbe was an at-will employee who was owed no fiduciary duty by the Firm; his contract claims failed for lack of definiteness; and his remaining claims were duplicative or failed for lack of a valid damages disclosure. After the court announced its intention to dismiss Schnibbe's counterclaims with prejudice, the parties stipulated that the court should also dismiss the Magleby Parties' affirmative claims, but without prejudice to reinstatement in the event Schnibbe mounted a successful appeal regarding his counterclaims. The court then entered orders and a judgment to that effect, dismissing the Magleby Parties' affirmative claims without prejudice, and Schnibbe's counterclaims with prejudice.

ISSUE AND STANDARD OF REVIEW

¶16    Schnibbe appeals the court's dismissal of his counterclaims on summary judgment. "We review a district court's grant of summary judgment for correctness and afford no deference to the court's legal conclusions." *Freight Tec Mgmt. Group Inc. v. Chemex Inc.*, 2021 UT App 92, ¶ 19, 499 P.3d 894 (quotation simplified).

ANALYSIS

¶17    Schnibbe's challenge to the district court's summary judgment order is multi-faceted—he challenges not only the court's conclusion that all his counterclaims were barred by the doctrine of accord and satisfaction, but also the court's alternative conclusions that his counterclaims fail for independent reasons. We need only discuss accord and satisfaction, however, because the district court correctly determined that, under the circumstances presented here, the elements of accord and satisfaction are met as a matter of law.

¶18    "Accord and satisfaction is a common law concept" that "denotes the intention of the contracting parties to agree that a different performance, to be made in substitution of the performance originally agreed upon, will discharge the obligation created under the original agreement." *Bodell Constr. Co. v. Robbins*, 2009 UT 52, ¶ 23, 215 P.3d 933 (quotation simplified). "When a claim is discharged through an accord and satisfaction, the claim is considered fully satisfied. The claimant no longer has the legal right to seek recovery from anyone on that claim." *Id.*

¶19    "To establish an accord and satisfaction, three elements must be present: (1) an unliquidated claim or a bona fide dispute over the amount due; (2) a payment offered as full settlement of the entire dispute; and (3) an acceptance of the payment as full settlement of the dispute." *Dishinger v. Potter*, 2001 UT App 209, ¶ 19, 47 P.3d 76 (quotation simplified), *cert. denied*, 40 P.3d 1135 (Utah 2001). Although "formation of a contract requires an offer,

an acceptance, and consideration," in cases of accord and satisfaction "the consideration requirement is satisfied by the settlement of a dispute between the parties," at least "where there is a bona fide dispute as to the amount due." *Wm. Douglas Horne Family Revocable Trust v. Wardley/McLachlan Dev., LLC*, 2013 UT App 129, ¶ 17, 304 P.3d 99 (quotation simplified). Because "accord and satisfaction is an affirmative defense," "the party alleging it" must "meet the burden of proof as to every necessary element." *Messick v. PHD Trucking Service, Inc.*, 615 P.2d 1276, 1277 (Utah 1980) (quotation simplified).

¶20    In his challenge to the district court's summary judgment order, Schnibbe contends that none of the three elements of accord and satisfaction are met here, at least not as a matter of law, and that the court erred in concluding otherwise. For the reasons that follow, we disagree.

¶21    The first two elements are, in our view, quite clearly satisfied here: the undisputed facts demonstrate that there was a bona fide dispute about the amount Schnibbe was owed, and that the Magleby Parties tendered the $1 million payment in an effort to fully settle the entire dispute. At the time the payment was made, both sides understood that there was some uncertainty regarding the exact amount Schnibbe was to receive. Schnibbe apparently believed that he was entitled to a payment of $5.5 million, and viewed the $1 million payment as being well short of what the Firm owed him. The Magleby Parties also understood that the payment amount was not fixed; indeed, in a post-verdict email, Magleby commented to Tomsic that Schnibbe would be owed at least $1 million but stated that "you and I know that we may go above $1 million, depending upon what happens." Schnibbe asserts that the amount owed was not in dispute but was "liquidated and quantifiable," but this would be true only if there had been definite rules as to whether the cap applied. The parties all understood that there were some circumstances under which Schnibbe might receive more than $1 million, but those circumstances were not well-defined, and the parties clearly had (and have) differing views on that point. Schnibbe therefore

overstates things more than a little bit when he asserts that the amount owed was liquidated or not in dispute. In our view, the first element of accord and satisfaction is met here.

¶22    And so is the second. This element requires us to examine things from the Magleby Parties' point of view, and to inquire as to whether those parties intended the $1 million payment to be a complete satisfaction of any obligation owed to Schnibbe related to the USA Power Case fee. And they quite clearly did. The Release and accompanying emails leave no doubt about the Magleby Parties' view of the purpose of the payment. As noted above, the Magleby Parties asked Schnibbe to sign the Release in connection with the payment, and the Release stated plainly that employees who signed it would acknowledge that they accept the payment provided and that they "have been fully compensated . . . for the promises and releases made" in the Release. And employees who signed the Release would "unconditionally release[]" the Firm and its principals "from any and all claims . . . that arise out of or related to" their employment. These provisions could hardly be more clear: the Magleby Parties were offering Schnibbe a payment that would serve to fully and completely discharge their obligations to Schnibbe with regard to the USA Power Case. In our view, there is no question that the $1 million payment was being offered as a "full settlement of the entire dispute." *Stearns Lending Inc. v. Pyle*, 2015 UT App 252, ¶ 28, 361 P.3d 672 (quotation simplified), *cert. denied*, 369 P.3d 451 (Utah 2016). Thus, we conclude that the second element of accord and satisfaction is met here.

¶23    While the first two elements are clearly satisfied as a matter of law, the third element presents a much closer question. That element requires us to examine Schnibbe's words and conduct, and to inquire as to whether Schnibbe indicated—through actions or otherwise—that he accepted the $1 million payment as full settlement of the dispute. We begin our inquiry into this third element with a discussion of how Utah's case law interpreting it has developed over time, and we explain that it has become firmly established in our law that a creditor who negotiates a restricted

check has accepted the offered accord. We then examine and reject Schnibbe's assertion that the situation presented here—in which the funds were transmitted to Schnibbe via direct deposit rather than by check—is materially different from the negotiated-check cases. Ultimately, we conclude that Schnibbe's decision to keep and use the money deposited into his account satisfies the third element of accord and satisfaction as a matter of law.

### A. Utah Law Regarding Acceptance: Negotiation of a Check Constitutes Acceptance as a Matter of Law

¶24 There are two basic ways to indicate acceptance of an accord and satisfaction: through express indication of intent (e.g., a statement saying "I accept"), or through actions clear enough to indicate acceptance. *See Dishinger*, 2001 UT App 209, ¶ 22 (stating that "the third element of accord and satisfaction may be satisfied by the creditor's subjective intent to discharge an obligation by assenting to the accord, *or* conduct which gives rise to a reasonable inference that acceptance of payment discharged the obligation"). The Magleby Parties do not contend that Schnibbe— who did not sign the Release—ever manifested an express indication that he was accepting the $1 million payment as a complete satisfaction of the Magleby Parties' obligation. Instead, the Magleby Parties contend that Schnibbe took actions—most significantly, retaining and using the money without complaint for several years—that constitute acceptance as a matter of law. In response, Schnibbe does not contest that he took those actions, but contends that other reasonable inferences—besides acceptance— can be drawn from the undisputed facts, and on that basis asserts that summary judgment is inappropriate and that he is entitled to a trial so that a jury can determine whether he intended to accept the $1 million payment as an accord.

¶25 Had the Magleby Parties made this argument in the 1950s, they likely would have been unsuccessful in winning this point on summary judgment. In a case with some similarities to this one, our supreme court held that "the facts of this particular case entitled plaintiff to go to the jury on his theory of the case." *Scoville*

*v. Kellogg Sales Co.*, 261 P.2d 933, 936 (Utah 1953). In *Scoville*, a company had a policy that, for all sales of turkey feed consummated in 1948, the salesman would get a "$2 per ton bonus." *Id.* at 935. The plaintiff—a salesman named Scoville—began selling feed in late 1948, and told his superiors that he anticipated that he would sell "500 cars of feed" in 1949, a scenario that—under the 1948 bonus policy—would result in a $30,000 bonus payment. *Id.* His superiors seemed undaunted by that figure and indicated that they "saw no reason why the bonus" structure would "be changed" for 1949. *Id.* But in July 1949, after Scoville had sold quite a bit of turkey feed, the company issued a new bonus plan that, if applied to Scoville's sales, would result in "a bonus far below" the bonus he would receive under the 1948 plan. *Id.* Scoville "acknowledged receipt" of the new plan, but "specifically did not accept or reject its terms." *Id.* Instead, he continued to work for the company for another few months without much further discussion of the matter. *Id.* In early 1950, the company sent Scoville two checks totaling about $4,000, along with a letter stating that the checks were to cover "the balance due on your bonus for 1949." *Id.* Scoville negotiated both checks without protest, and made no further complaint until "the end of 1950," when he wrote a letter to the company and followed up with a lawsuit seeking recovery of what he considered to be the entire 1949 bonus payment. *Id.* Under these circumstances, a three-justice majority of our supreme court held that "[t]he facts most favorable to [Scoville] are not such as would require all reasonable minds to conclude that there was such an acceptance, hence whether Scoville's actions were such as to constitute an acceptance also was a jury question." *Id.* at 936.

¶26   This decision drew a spirited dissent from two justices, who pointed out that Scoville had "received and acknowledged receipt of" the new bonus plan, "continued to work for" the company without making any "serious protest" for the next "17 months," and "received, endorsed, and cashed" the two checks. *Id.* at 940 (Wolfe, C.J., dissenting). The dissenting justices found persuasive this passage from *Corbin on Contracts*:

> Where the amount due is in dispute, and the debtor sends cash or a check for less than the amount claimed, clearly expressing his intention that it is sent as a settlement in full, and not on account or in part payment, the retention and use of the money or the cashing of the check is almost always held to be an acceptance of the offer operating as a full satisfaction, even though the creditor may assert or send word to the debtor that the sum is received only in part payment.
>
> . . . . [I]t makes no difference that the creditor did not know that the effect of his cashing the check or keeping the money would be the discharge of his entire claim.

*Id.* at 941 (quoting 6 A. Corbin, *Corbin on Contracts* § 1279 at 97 (1951)). Thus, the dissenters disagreed with the majority's conclusion, opining that "[w]hen the majority opinion states that under these facts it was a jury question as to whether there was an accord and satisfaction, it is allowing the jury to determine a question of law." *Id.*

¶27   While the position of the dissenting justices in *Scoville* garnered only two votes in 1953, our supreme court—without ever expressly overruling *Scoville*—eventually came to espouse their position. In *Marton Remodeling v. Jensen*, 706 P.2d 607 (Utah 1985), a debtor sent a creditor a check marked "full and final satisfaction of any and all claims." *Id.* at 608. The creditor attempted to conditionally accept the check by not only sending the debtor a letter "demand[ing] the balance" and stating that he was "refusing to accept the check in full payment," but also by writing "not full payment" on the check when he cashed it. *Id.* This time, a four-justice majority held that the elements of accord and satisfaction were present as a matter of law, despite the creditor's evident efforts to express his unwillingness to accept the payment as an accord. *Id.* at 608–10. Without making any

reference to *Scoville*, the majority relied on the exact same section of the *Corbin* treatise relied on by the *Scoville* dissent—section 1279[5]—and concluded that "[i]t is of no legal consequence that [the creditor] told [the debtor] upon receipt of the . . . check that he did not regard it as payment in full." *Id.* at 609. In such a situation, the court reasoned, "'[t]he creditor's action . . . is quite inconsistent with his words.'" *Id.* (quoting 6 A. Corbin, *Corbin on Contracts* § 1279 at 129–30 (1962)). Under the court's view of the law, the creditor had "the choice of accepting the check on [the debtor's] terms or of returning it," and the court concluded that this bright-line rule served to further the goals of "compromise," "limit[ing] litigation," and streamlining business transactions.[6] *Id.* at 610 (quotation simplified). Indeed, the court further reasoned that, "if we were to decide that a creditor can reserve his rights on a 'payment in full' check, it would seriously circumvent what has been universally accepted in the business community as a convenient means for the resolution of disagreements." *Id.* (quotation simplified).

¶28    In the years following *Marton Remodeling*, this court—as it is bound to do—followed the reasoning of our supreme court's most recent ruling on the issue. *See Cove View Excavating & Constr.*

---

5. Section 1279 of *Corbin on Contracts* had been edited in the years between 1953 and 1985, but while the treatise used somewhat different language in 1985 than it did in 1953, it still conveyed the same idea: that a creditor who negotiates a restricted check has accepted an offered accord. *Compare Scoville v. Kellogg Sales Co.*, 261 P.2d 933, 941 (Utah 1953) (Wolfe, C.J., dissenting) (quoting 6 A. Corbin, *Corbin on Contracts* § 1279 at 97 (1951)), *with Marton Remodeling v. Jensen*, 706 P.2d 607, 609 (Utah 1985) (quoting 6 A. Corbin, *Corbin on Contracts* § 1279 at 126–30 (1962)).

6. As concerns commercial transactions, Utah law provides that negotiation of a check "tendered as full satisfaction of" a claim constitutes discharge of the claim, unless the funds are returned within ninety days. *See* Utah Code § 70A-3-311(2), (3)(b). No party suggests that this statute applies here.

*Co. v. Flynn*, 758 P.2d 474, 477–79 (Utah Ct. App. 1988) (relying on *Marton Remodeling* and section 1279 of *Corbin on Contracts*, and concluding that a creditor's negotiation of a check marked "payment in full" constituted acceptance of the accord because "his retention of the money . . . operat[es] as an assent," notwithstanding the creditor's action in crossing out the "payment in full" notation on the check (quotation simplified)); *Bench v. Bechtel Civil & Minerals, Inc.*, 758 P.2d 460, 461–62 (Utah Ct. App. 1988) (relying on *Marton Remodeling* and concluding that the creditor had accepted an accord by "continuing employment . . . under the terms of the revised compensation plan" and negotiating a check marked "settlement of net final wages"); *cf. Gary Porter Constr. v. Fox Constr., Inc.*, 2004 UT App 354, ¶ 15 n.2, 101 P.3d 371 (noting that this court is "bound by the Utah Supreme Court's most recent interpretation" of a rule), *cert. denied*, 123 P.3d 815 (Utah 2005).

¶29 A few years later, in 1992, our supreme court issued perhaps its strongest statement on the subject, effectively cementing into Utah law the notion that an accord and satisfaction exists, as a matter of law, when a creditor keeps a payment intended as payment in full of a disputed amount, even if that creditor does so under protest. *See Estate Landscape & Snow Removal Specialists v. Mountain States Tel. & Tel. Co.*, 844 P.2d 322, 330 (Utah 1992). In *Estate Landscape*, the creditor—before negotiating the check—had first made sure to file a lawsuit against the debtor, specifically alleging that the payment was not payment in full and seeking a judgment for the unpaid balance. *Id.* at 325. But the court nevertheless held that accord and satisfaction was present as a matter of law, the creditor's lawsuit notwithstanding. *Id.* at 329–30 (stating that "mere negotiation" of a restricted check "constitutes the accord, regardless of the payee's efforts or intent to negate" the restriction). The court determined that, regardless of the clarity of any expressed "subjective intent not to accept the lower payment as full discharge of their claims," a creditor's decision to negotiate a restricted check and retain the funds constitutes acceptance, because those actions are clear enough to render the creditor's

"subjective objections . . . irrelevant." *Id.* at 330 (also stating that "what is said is overridden by what is done, and assent is imputed as an inference of law" (quotation simplified)).

¶30    Since *Estate Landscape*, we have continued to follow the same principles. *See Dishinger*, 2001 UT App 209, ¶ 26 (discussing *Estate Landscape* and stating that "where, as here, the check is tendered under the condition that negotiation will constitute full settlement, mere negotiation of the check constitutes the accord, regardless of the payee's efforts or intent to negate the condition" (quotation simplified)). We have even held that the opposite position—the one once espoused by a majority of our supreme court in *Scoville*, namely, that a creditor who negotiates a restricted check is entitled to a jury trial for resolution of competing inferences regarding acceptance—is now considered "frivolous." *See ECO Mktg., Inc. v. Hardesty*, 2003 UT App 148U, paras. 4–5 (citing *Estate Landscape* and *Marton Remodeling*, stating that "[t]he law in regard to what constitutes an accord and satisfaction, in this context, has been clear for many years," and awarding attorney fees pursuant to rule 33 of the Utah Rules of Appellate Procedure).

¶31    Thus, even though *Scoville* has not been expressly overruled, in our view that case has been implicitly superseded by subsequent cases. It is now clearly established in Utah law that a creditor who cashes or negotiates a check intended as payment in full of a disputed amount is deemed—as a matter of law—to have taken action clear enough to indicate acceptance of an accord, even if the creditor contemporaneously makes clear its subjective intent *not* to accept the accord.[7]

---

7. The only check-negotiation cases decided to the contrary in recent years—that is, cases in which the court did not rule in favor of the debtor on "acceptance" as a matter of law—are distinguishable. *See, e.g., Neiderhauser Builders & Dev. Corp. v. Campbell*, 824 P.2d 1193, 1197–98 (Utah Ct. App. 1992) (holding

(continued…)

### B. Direct Deposit

¶32    Schnibbe does not quibble with this case law, as far as it goes; he recognizes, as he must, that under Utah law he would have been deemed to have accepted the accord if the Firm had paid him by check and he had negotiated that check. But he asserts that those cases are distinguishable, because in each of them the creditor had taken "an affirmative act" indicative of acceptance: negotiating the check. He emphasizes that, in his case, the money simply appeared in his bank account, without him having taken any action to put it there, and he argues that this situation is therefore materially different from situations in which a creditor actively endorses and negotiates a restricted check. As he sees it, his "passive retention of funds, paid unilaterally by the debtor through direct deposit," is not the sort of affirmative act that constitutes acceptance of the accord as a matter of law.

¶33    We take Schnibbe's point that a creditor who negotiates a check has taken an additional affirmative act that a person who has been paid via direct deposit—or other similar method (e.g., Venmo or Zelle)—does not need to take in order to claim the money. And we acknowledge that no Utah appellate court has yet

---

that a debtor was entitled to a trial on accord and satisfaction where the debtor had raised a question about whether it had made a unilateral mistake in computing the amount owed); *Vali Convalescent & Care Insts. v. Division of Health Care Fin.*, 797 P.2d 438, 450–52 (Utah Ct. App. 1990) (holding that no accord and satisfaction existed where it was unclear whether the offer had been intended to include interest); *Spor v. Crested Butte Silver Mining, Inc.*, 740 P.2d 1304, 1308–09 (Utah 1987) (holding that a debtor was entitled to a trial on accord and satisfaction where it was unclear "whether the prepayment of the loan was intended to satisfy all obligations of both parties under the" contract); *Tates, Inc. v. Little Am. Refin. Co.*, 535 P.2d 1228, 1231–32 (Utah 1975) (concluding that no accord and satisfaction was present where the check in question was not marked "payment in full" or with any "words of that import").

wrestled with the question of whether this distinction matters. The Magleby Parties, naturally, assert that it doesn't, especially where—as here—Schnibbe not only retained and apparently used the money,[8] but also continued working at the Firm for several more years without direct complaint.

¶34    As we see it, there are two important variables that interact with each other in these cases. The first is how the money is transmitted to the creditor: by regular check, cashier's check, or direct deposit. With a regular check, creditors are required to take an affirmative act—endorsing and negotiating the check—in order to take the money from the debtor's account and move it to their own. With a cashier's check, the money has already been removed from the debtor's account at the time the check was created, but creditors still need to negotiate the check in order to place the money in their own account. But with direct deposit, creditors need not take any action in order to move the money into their account; instead, the money simply appears there passively, without requiring the creditor to do anything. In Schnibbe's view, this variable matters a great deal; indeed, he asserts that acceptance of an accord does not exist—at least not as a matter of law—in cases where money simply appears in a creditor's account via direct deposit.

¶35    The second variable is what the creditor does with the money after receiving it: returning it to the debtor, setting it aside,

---

8. Schnibbe did not return the money to the Firm, and there is no indication in the record that he made any effort to set aside (e.g., escrow) the money rather than simply use it. At any rate, Schnibbe makes no such argument. We therefore assume, for purposes of our analysis, that once the money was deposited into Schnibbe's account, it became commingled with his other personal funds, earned interest, and was available for his personal use over the next few years. In the end, however, whether Schnibbe actually spent those particular dollars is of relatively little consequence because the salient fact is that Schnibbe retained the funds and has made no effort since 2016 to return them to the Firm.

or keeping and using it. Returning the money—whether transmitted by check or direct deposit—to the debtor is a strong signal that the creditor does not accept the money as an accord. Setting the money aside—whether by placing an uncashed check in a drawer, or placing money in a separate escrow account—may or may not carry the same connotation. But keeping (and presumably using) the money, even where passively placed in the creditor's account, may fairly be viewed as an indication that the creditor intends to accept the accord offered by the debtor. The Magleby Parties emphasize this second variable, and assert that, because Schnibbe retained the funds in his own account and presumably spent them, he should be deemed to have accepted the accord, regardless of the passive way in which the money found its way into his account. We agree with the Magleby Parties that this second variable is the more important one in this case, and conclude that creditors who receive money by direct deposit that is intended as payment in full of a disputed amount, and who keep the money in their account—instead of either returning the money within a reasonable time or, at a minimum, separating it or setting it aside and registering protest—will be deemed to have accepted the money as an accord and satisfaction.

¶36 While no Utah appellate court has grappled directly with the direct deposit situation in this context, several Utah cases have mentioned "retention of the money" as a critical factor indicating acceptance. *See Marton Remodeling*, 706 P.2d at 609 (quoting section 1279 of *Corbin*, and stating that "[t]he fact that the creditor scratches out the words 'in full payment' or other similar words indicating that the payment is tendered in full satisfaction, does not prevent *his retention of the money* from operating as an assent to the discharge" (emphasis added)); *Cove View*, 758 P.2d at 478 (same quote); *Scoville*, 261 P.2d at 941 (Wolfe, C.J., dissenting) (also quoting section 1279 of *Corbin*, and stating that "*the retention and use of the money or* the cashing of the check is almost always held to be an acceptance" (emphasis added)). And this position seems to be in line with most of the cases from other jurisdictions that have taken up the issue.

¶37    For instance, one court has held that a creditor who merely retained—but did not deposit or use—a cashier's check received from the debtor and intended as payment in full had accepted the check as an accord. *See Day-Luellwitz Lumber Co. v. Serrell*, 177 Ill. App. 30, 39 (1913). The court emphasized that a cashier's check was "something for which the debtor has paid consideration and which has tied up out of his use and control the amount which he paid or was charged for it unless and until it is returned to him," *id.* at 37, and was "supposed to be negotiated promptly or presented promptly," *id.* at 39. The court stated that, "although there was no intention on the part of the creditor at any time to receive the [cashier's check] as full payment, the law would hold that he had so taken it if he had retained it an unreasonable time without repudiation." *Id.* at 37. The court held that retention of the check for more than three months was unreasonable, and that the creditor's actions in "neglect[ing]" to "return or act in any way on the [cashier's check] was equivalent in its effect on the [debtor] to cashing it." *Id.* at 39.

¶38    Much more recently, other courts have similarly concluded that a creditor's retention of money received through a direct or automatic deposit constitutes acceptance of an accord and satisfaction. In one case, a debtor tendered payment to a creditor by sending a restricted check "to a lock box in which checks are automatically deposited" into the creditor's bank account. *Corporate Plaza Assocs., LLC v. Interactive Video Techs., Inc.*, No. 01 CIV 3241 (RWS), 2002 WL 424308, at *1 (S.D.N.Y. Mar. 19, 2002). The creditor kept, and did not return, the money, even after discovering that it had been automatically deposited into its account. *Id.* The court acknowledged that it was at least "arguable that [the creditor] did not deliberately accept the payment of the check . . . due to its being sent to an automatic deposit system." *Id.* at *2. But the court held that, even if the creditor had not deliberately accepted the payment, "it *did* deliberately retain the funds despite a letter [from the debtor] clearly stating that the receipt thereof would be considered in full satisfaction of the larger debt." *Id.* And the creditor "has had the use and benefit [of the money] for approximately nine months." *Id.* Under those

circumstances, the court held that the creditor "evidenced sufficient intent to accept the satisfaction by this retention and use," and that "any failure to return the money amounts to acceptance." *Id.* at *2–3.

¶39   And in another case, the "accounting department" of a corporate creditor "routinely endorsed and deposited" a restricted check sent by a debtor and marked as "full payment" of a disputed amount. *Teledyne Mid-Am. Corp. v. HOH Corp.*, 486 F.2d 987, 991 (9th Cir. 1973). Following the routine deposit of the check, the company made no effort to return the money to the debtor, even though it "protested the offset" and informed the debtor that "it was treating the disputed tender as a partial payment" of the amount owed. *Id.* at 994. The court acknowledged that "the cashing of the check" did not, under those circumstances, "*per se* constitute an accord and satisfaction," but it nevertheless held that the creditor's "retention and use" of the funds did constitute acceptance as a matter of law, and it affirmed the lower court's entry of summary judgment in the debtor's favor. *Id.* at 994–95.

¶40   Many leading commentators agree that mere retention of funds is sufficient to constitute acceptance of an accord. As noted in one frequently cited treatise, for example, a "creditor's use of a check or draft . . . sent to the creditor as full satisfaction of a larger claim, as by cashing, depositing, or collecting it, or *otherwise availing herself of it*, constitutes an acceptance." 1 C.J.S. *Accord and Satisfaction* § 57 (2023) (emphasis added); *see also* 29 *Williston on Contracts* § 73:46 (4th ed. 2023) (stating that "most courts to have considered the question" of whether "retention of a check offered as payment in full of an obligation necessarily involves an acceptance of the condition upon which it was tendered" agree that it does "because the creditor has no more right to retain the check for an unreasonable time than it has to cash it, unless the creditor accepts it as full satisfaction").

¶41   After examining Utah law and relevant out-of-state authorities, we agree with this assessment of the law provided by the United States Court of Appeals for the Tenth Circuit: "Utah

precedent, federal precedent, and commentators have all made clear [that] *retention* of a check offered as payment in full constitutes assent to the accord and satisfaction even if the recipient of the check notifies the sender it is accepted only as a partial payment." *Valley Asphalt Inc. v. Stimpel Wiebelhaus Assocs.*, 3 F. App'x 838, 840 (10th Cir. 2001) (emphasis added).

¶42    Schnibbe resists these authorities by citation to the general contract principle that "[o]rdinarily an offeror does not have power to cause the silence of the offeree to operate as acceptance." *See* Restatement (Second) of Contracts § 69 cmt. a (Am. L. Inst. 1981); *see also Somervell v. Baxter Healthcare Corp.*, 1998 WL 203145, at *2 (D.C. Cir. Mar. 13, 1998) (per curiam) (stating that one party "could not, merely by depositing the money into [the other party's] account, create the presumption that [the other party] accepted the terms of the agreement if she did not subsequently return the funds"). But these authorities do not purport to be discussing the doctrine of accord and satisfaction; instead, they are concerned with whether an original contract can be formed by the unilateral payment of money.

¶43    In the specific accord and satisfaction context, by contrast, a creditor's retention of funds is an action—whether characterized as affirmative or passive—that indicates a willingness to accept an accord and satisfaction. We therefore perceive no dispositive distinction between a creditor who negotiates a restricted check and thereby facilitates the placement of funds in its account, and a creditor who elects to retain funds placed into its account by direct deposit.[9] Accordingly, we conclude that, under Utah law, a

---

9. We acknowledge Schnibbe's point that, as a practical matter, returning funds that appear in one's account by direct deposit may be more difficult than returning an uncashed check. But we do not view any such difficulties as dispositive; there are certainly readily available ways to retrieve money out of one's bank account and send it to someone else. And we are unpersuaded by Schnibbe's argument that, because some of the $1 million was

(continued…)

creditor who retains money—whether transmitted by direct deposit or by check—that the debtor intends as payment in full of a disputed amount will be deemed to have accepted that payment as an accord and satisfaction, regardless of the creditor's potential subjective intent to the contrary.

¶44 Thus, creditors who receive money by direct deposit, and who do not intend to accept that money as an accord and satisfaction of a disputed amount, are well advised to return the money to the debtor within a reasonable time; if they do so, they will almost certainly not be deemed to have accepted the accord, regardless of the method by which they received the money. *See Estate Landscape*, 844 P.2d at 330 (stating that creditors' "options [are] to accept the checks on their debtors' terms or to refrain from negotiating the checks and seek the entire sums through the judicial process"); *see also, e.g.*, *Karvalsky v. Becker*, 29 N.E.2d 560, 563 (Ind. 1940) (holding that there was no accord and satisfaction because the creditor promptly returned the check); *Bill Munday Pontiac, Inc. v. Satterwhite*, 586 S.W.2d 946, 948 (Tex. Civ. App. 1979) (holding that there was no accord and satisfaction because the creditor returned the check after two months). But creditors who elect not to return, within a reasonable time, money received by direct deposit run a high risk—even if they register sharp protest—of being deemed to have accepted the accord, just like creditors who negotiate a check under similar circumstances.

¶45 Under the circumstances here, we have no trouble concluding that Schnibbe failed to return the deposited funds within a reasonable time. After all, he kept the money for four years before filing suit, and has made no effort to return the funds even after filing suit. By itself, this is a strong indication, under

---

paid to taxing authorities through withholdings, the full $1 million was not returnable; this issue arises regardless of method of payment—an employee paid by check may have the same withholdings issue—and, obviously, creditors seeking to indicate non-acceptance of a potential accord are only responsible for *returning* that portion of a payment that is actually given to them.

applicable law, that Schnibbe intended to accept the money as an accord and satisfaction. In addition, although Schnibbe did not sign the Release, he remained employed at the Firm for another four years, and registered no protest to either Magleby or Tomsic about the payment for some two years after receiving it. On these facts, we perceive no error in the district court's conclusion that Schnibbe's actions constitute acceptance of the accord and satisfaction as a matter of law.

## CONCLUSION

¶46    All three elements of accord and satisfaction are met here as a matter of law. The district court therefore correctly entered summary judgment in favor of the Magleby Parties on that basis.

¶47    Affirmed.

———————